HONORABLE BARBARA ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AMIE DRAMMEH, and YUSUPHA CEESAY, Individually, as Surviving Parents of CHERNO CEESAY; and MARAM CEESAY, Personal Representative of the Estate of CHERNO CEESAY;<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation, RASIER LLC, and THE FIRST DOE THROUGH ONE HUNDREDTH DOE, INCLUSIVE;<br><br>Defendants. | No. 2:21-cv-202<br><br>**FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Amie Drammeh, Cherno Ceesay's mother; Yusupha Ceesay, Cherno Ceesay's father; and Maram Ceesay, as Personal Representative of the Estate of her brother Cherno Ceesay, bring this First Amended Complaint for damages against Defendants Uber Technologies, Inc., Rasier LLC (collectively, "Uber"), and Does 1–100, and allege the following:

## I. NATURE OF THE CASE

1. This action arises from the December 13, 2020 stabbing death of Cherno Ceesay, a young Uber driver whom Uber matched with two customers who opened their Uber account moments earlier with fabricated personal information and an unverified form of payment. Uber knew its drivers—essential players in the wildly profitable Uber enterprise—were at high risk of violent assault by passengers, yet Uber abdicated its duty to those drivers to protect them from that risk using simple, available, effective measures.

First Amended Complaint for Wrongful Death and Survivorship - 1

**WEINSTEIN CAGGIANO PLLC**
600 University Street, Suite 1620
Seattle, Washington 98101
(206) 508-7070 - Facsimile (206) 237-8650

2.    Since its founding in San Francisco in 2010, Uber has grown rapidly into a multi-billion-dollar enterprise with operations worldwide. Uber's phenomenal growth is due in large part to its success in shifting costs of its business to its drivers, who are independent contractors, its evasion of regulations governing other for-hire driving services, and lax security screening processes.

3.    For decades, simple and inexpensive safety measures have been utilized that protect for-hire drivers from assault, including installation of barriers between the front and back seats and of surveillance cameras, or "dash cams." Yet Uber did nothing to ensure Mr. Ceesay—who was driving a car Uber provided through one of its car–rental vendors—had the benefit of such protections, nor did it even warn Mr. Ceesay of the importance of such protections.

4.    Moreover, although Uber has developed and commercialized some of the most sophisticated data collection and analysis in the world, and screens out potentially violent or dangerous drivers from offering rides, here it failed to employ basic identity-verification technology to screen out the two customers who murdered Mr. Ceesay—even though they opened the Uber account using a fake name and unverified form of payment just minutes before calling for the ride. And while Uber knows its drivers are at risk of assault by passengers and does not adequately screen new customers, it discourages drivers from using their own judgment to avoid potentially unsafe situations by penalizing them for failing to accept rides.

5.    As a direct and proximate result of Uber's failure to take simple and available steps to protect Mr. Ceesay from potentially violent customers, he was stabbed to death the night of December 13, 2020, moments after he picked up new Uber customers intent on stealing his car.

6.    Uber's conduct evinces a conscious attitude and corporate policy of "profits over people" characterized by a willful and knowing disregard for the rights and safety of others so base and contemptible as to be looked down on and despised by reasonable people.

## II.    JURISDICTION AND VENUE

7.    Personal jurisdiction over the Defendants exists as Defendants conducted substantial business activities in Washington and this cause of action arises out of these business activities, such that

First Amended Complaint for Wrongful Death and Survivorship - 2

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

the exercise of personal jurisdiction does not offend due process.

8. This Court has diversity jurisdiction under U.S.C. § 1332 over the above-captioned cause because the amount in controversy exceeds $75,000.00 and the Plaintiffs and Defendants are residents of different states.

9. Plaintiff Maram Ceesay is a resident of Dallas County, Texas; the Estate was opened in King County, Washington, and Plaintiff Amie Drammeh is a resident of Snohomish County, Washington. Plaintiff Yusupha Ceesay is a resident of The Gambia.

10. Defendant Uber Technologies, Inc. is a Delaware Corporation with its principal place of business in San Francisco, California. Defendant Rasier LLC (Rasier) is a Delaware Limited Liability Company with its principal place of business in San Francisco, California. Upon information and belief, none of Rasier LLC's members are residents of Washington and/or Texas.

### III. PARTIES

11. Plaintiff Maram Ceesay resides in Dallas, Texas. She was appointed personal representative of the Estate of her brother, Cherno Ceesay, by an order of the King County Superior Court on February 1, 2021. Cherno, a hardworking 28-year-old, immigrated to the United States from The Gambia with members of his family nineteen years ago. At the time of his death, he was living in Kirkland, Washington, near his mother, and had been driving for Uber for about four years. He was saving to start a business, and to that end, sometimes worked seven days a week. Maram Ceesay brings this action under RCW 4.20.010, *et seq.* for the Estate's economic damages and for Cherno's claims surviving death pursuant to RCW 4.20.046.

12. Plaintiff Amie Drammeh is Cherno Ceesay's mother. She lives in Bothell, Washington. Ms. Drammeh brings this action under the Death of a Child statute (RCW 4.24.010) for loss of her son's love and companionship, and for destruction of the parent-child relationship.

13. Plaintiff Yusupha Ceesay is Cherno Ceesay's father. He lives in The Gambia and likewise brings this action under the Death of a Child statute (RCW 4.24.010) for loss of his son's love and companionship, and for destruction of the parent-child relationship.

14. Defendant Uber Technologies, Inc. is a Delaware Corporation with its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California, 94103. Uber operates throughout the United States and internationally in over 500 cities, including in Seattle, Bellevue, Kirkland, and Issaquah, Washington.

15. Defendant Rasier is a Delaware Limited Liability Company with its principal place of business in San Francisco, California. It is a wholly owned subsidiary of Uber Technologies and is the party that directly contracts with drivers. Uber Technologies and Rasier may be collectively referred to herein as "Uber".

16. The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants First DOE through One Hundredth DOE, inclusive, are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiff, as hereinafter alleged.

## IV.   STATEMENT OF FACTS

### A.   Uber Knows Its Drivers Face Very High Risk of Assault But Fails to Take Any Reasonable Steps to Protect Them From That Risk.

16. The occupation of driver for a ride-hailing service, whether the ride is hailed by phone call, by app, or by an extended arm on a street corner, is among the most dangerous in the United States.[1] A 2010 OSHA publication, for example, notes that "Taxi drivers are over 20 times more likely to be murdered on the job than other workers."[2]

---

[1] *See* CAMMIE K. CHAUMONT MENENDEZ, ET. AL., WORK-RELATED VIOLENT DEATHS IN THE US TAXI AND LIMOUSINE INDUSTRY 2003 TO 2013, 56 (8) J OCCUP ENVIRON MED, 768–774 (2017).

[2] Occupational Safety and Health Administration (OSHA), *Fact Sheet Workplace Violence: Preventing Violence Against Taxi and For-hire Drivers* (2010) *available at* www.osha.gov/Publications/taxi-driver-violence-factsheet.pdf; *see also* OSHA's 2019 NIOSH *Fast Facts Taxi Drivers How to Prevent Robbery and Violence* (2019) *available at* https://www.osha.gov/sites/default/files/publications/OSHA3976.pdf.

17. Uber itself recently undertook to investigate the problem of passenger assaults on its drivers (as well as the highly publicized problem of Uber-driver assaults on passengers). Uber's own investigation, completed in late 2019, found that its drivers were about as likely to be the victims of sexual assault by passengers as to be the victimizers, and that roughly the same number of Uber drivers and passengers were victims of fatal physical assaults while using the company's platform.

### 1. Physical Barriers and Cameras Protect Drivers But Uber Does Nothing To Ensure Their Installation and Use.

18. The risk of passenger assaults on drivers can be mitigated. For decades, OSHA has recommended that companies offering for-hire car services employ physical and procedural precautions to protect drivers from the risk of assaults by passengers. Among the controls long recommended by OSHA, and supported by scientific studies, are physical barriers between drivers and passengers, and surveillance cameras.

19. In order to drive for Uber, driver applicants' vehicles must be inspected and approved by Uber. Vehicles are inspected as part of the driver's initial application, and then again on an annual basis. Uber's inspection ensures the driver's car meets Uber's standards for safety, presumably to protect passengers—such as functioning tires, doors, horn, brakes, lights, seatbelts and turn signals.

20. Uber drivers who do not own a vehicle or whose personal vehicle does not meet Uber's safety requirements must rent a car exclusively through Uber's "Vehicle Marketplace." This "Vehicle Marketplace" connects Uber drivers with Uber-approved vehicles available to rent from an Uber-approved rental partner. Uber specifically prohibits Uber drivers from contracting with car rental companies outside the Vehicle Marketplace.

21. Despite knowing the risks of passenger assaults on its drivers and its control over vehicle safety features, Uber does not provide or require any sort of safety measures in its drivers' cars to protect its drivers—features like a physical partition between the driver and passenger seating, or a security camera. Nor does Uber warn its drivers of those risks or train them to identify particularly dangerous situations or passengers.

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 5

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

## 2. Uber Fails to Utilize Its Enormous Technological Capabilities to Screen or Implement Identity and Fraud Checks of New Customers.

22. Uber does not verify the identity of or screen new passengers for fraud, even though Uber has the technology and ability to do so.

23. Uber requires prospective Uber drivers to pass background checks before they can begin accepting rides through the Uber application. Uber's 2017–2018 US Safety Report boasts:

> Every US driver undergoes an annual Motor Vehicle Record (MVR) review and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.
> . . .
> Uber's background-check process is very rigorous. During 2017 and 2018, more than one million prospective drivers did not make it through Uber's screening process . . .
>
> Uber will disqualify individuals with any felony convictions in the last 7 years. If we identify a report for **certain serious criminal convictions**—including sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnapping—**at any time** in the person's history, the potential driver will be disqualified according to our standards.
> . . .
> Beyond performing annual background check reruns, we were the first US ridesharing company to implement continuous driver screening technology, which monitors and flags new criminal offenses through a number of data sources and then notifies us so we can take action to ensure that every driver continues to meet our high standards. Since we launched this technology, more than 40,000 drivers have been removed from the app due to continuous screening.[3]

24. In contrast, prospective passengers are not subject to any form of background check or identity verification process to open an Uber account. Uber does not perform even perfunctory screening of prospective passengers' payment information for fraud or stolen identity. To open an

---

[3] *See* Uber's 201718 U.S. Safety Report, *available at* https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id (emphasis added).

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 6

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

account as a passenger, an individual need only input a phone number, email address, and payment method. Permitted payment methods include credit and debit cards, PayPal, Venmo, digital wallets, and Uber gift cards. Uber allows users to scan or upload a photo of a credit card through the app. This entire process can be completed in a matter of minutes with fabricated information.

25. Uber has elected not to screen new customers or implement identity checks despite its knowledge that drivers are about as likely as passengers to suffer a fatal physical assault during an Uber ride.[4] Indeed, while Uber recognizes the need for vigorous background checks for drivers, individuals opening a new account are subject to essentially no screening before they get into the same enclosed space with an unprotected driver who has his or her back to the passenger and eyes focused on the road.

26. Uber also has massive data collection and analysis capabilities that could be harnessed to identify and screen out users using fraudulent or stolen identities—if it chose to do so.

27. For example, Uber has touted a new initiative called "Uber Movement", which "shares anonymized data aggregated from over ten billion trips to help urban planning around the world." Uber Movement offers several products to city officials, planners, and consultants, including datasets measuring zone to zone travel times across cities, street speeds, and the volume of activity on mobile devices in a given location.

28. Uber has also used its technological capabilities for purposes other than urban studies or lawful profit-making. In 2017, it was reported that Uber had created software internally dubbed "Hell", which, through fake Lyft accounts and fake ride requests, was able to determine which of its drivers were also driving for Lyft and when they were most likely to log into the Lyft app, and

---

[4] *See id.* Within the studied time frame, the victims of fatal physical assaults related to the use of the Uber platform included 8 riders and 7 drivers.

then offer them Uber incentives to deter them from doing so.[5] It was separately reported that since 2014, Uber had been using another program internally referred to as "Greyball" to "identify and circumvent officials who were trying to clamp down on the ride-hailing service" by using data collected from the Uber app and other techniques.[6] These techniques included showing officials a fake version of the app, with fake animated cars on a map, to evade detection.

29. The privacy section on Uber's website discloses that it collects individual rider data including the following: name, email address, mobile number, rating(s), and the date signed up with Uber; referral code(s) issued by Uber; payment method information, such as the date the rider created and updated a payment method, the issuing bank's name, billing country, and payment method type; metadata about support conversations with Uber; times and locations at which a trip was requested, started, and ended; distance traveled; trip prices and currency; 30 days of mobile event data, such as device OS, device model, device language, app version, and the time and location that the data was collected.

30. Given Uber's state of the art data triangulation capabilities, it could use data pattern analysis to "red flag" miscreant passengers who are utilizing false or stolen identities or bogus payment information to hire Uber drivers. Instead, Uber has used these capabilities to attempt to thwart its rival Lyft, to evade regulators, and to analyze traffic speeds. It did not, in connection with the events alleged herein, use these capabilities to keep its driver Cherno Ceesay safe from dangerous criminals on its platform.

### 3.    Uber's Perverse Incentives Put Drivers at Risk.

31.    In addition to Uber's failure to use existing technology to screen out or flag potentially

---

[5] *See* Catherine Shu, *Uber Reportedly Tracked Lyft Drivers Using a Secret Software Program Named "Hell"*, TechCrunch (April 13, 2017), *available at* https://www.inverse.com/article/30302-hell-uber-driver-stalking-app.
[6] Mike Isaac, *How Uber Deceives Authorities Worldwide*, The New York Times (Mar. 3, 2017), *available at* https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html.

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 8

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

fraudulent passengers, Uber uses a system of perverse incentives and penalties that restrict drivers' autonomy over their personal safety.

32. Uber penalizes drivers for declining or canceling rides. For example, if a driver declines a certain percentage of ride requests, he or she risks being moved to the bottom of Uber's queue vis-a-vis other drivers for ride requests in a busy area, such as an airport. Drivers also risk suspension or deactivation of their Uber account for declining too many rides.

33. Uber drivers are provided almost no information about passengers and trip details until after they accept a ride request--just the first name of the passenger, the length of the trip, and the pick-up location. Drivers are not provided with a photo of the passenger. With no photo and no full name, drivers have no way of verifying that the person who requested the ride is actually the person they pick up.

34. Uber also creates perverse incentives to encourage the maximum number of rides. Uber offers flat bonuses or increased payouts per ride when drivers accept a certain number of rides. Because payouts to drivers are so low in relation to their time and costs, these "bonuses" or increased payouts may be the difference between profitability or not after the driver's expenses are deducted.

### 4. Uber is a Common Carrier.

35. Uber offers to carry and transport members of the general public and holds itself out to the public as an on-demand form of transportation available to anyone who wants to use it.

36. Uber provides a similar service to taxis and competes with taxi services in providing transportation to members of the public.

37. As of May of 2017, Uber—through its drivers—had provided five billion rides to members of the public. Three billion of those rides had occurred between December 31, 2015, and May 20, 2017—meaning that the company provided an average of 5.9 million rides a day, or 247,000 rides an hour during this 17-month period alone.

38. Uber is available to the general public through the Uber App for anyone to download with a smartphone. Neither drivers nor riders are charged a fee to download the Uber App. Uber's primary source of revenue is from charging its customers for transportation.

First Amended Complaint for Wrongful Death and Survivorship - 9

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

39. By its own admission, Uber wants to be available for "everyone." Uber has held itself out as "Everyone's Private Driver."

40. Uber policy prohibits drivers from refusing to provide services based on the rider's destination.

41. Uber charges customers standardized fees for car rides, setting its fare prices without driver input. Drivers may not negotiate fares.

42. In 2015, Uber's CEO stated that in San Francisco alone, its most mature market, Uber's revenue was three times larger than that of the local taxi market, in excess of $500 million per year. The revenue generated through Uber's activities substantially contributes to the financial requirements of the Uber's operations.

43. Uber requires drivers to accept all ride requests when logged into its App or else face potential discipline. Uber expects its drivers to comply with all relevant state, federal and local laws governing the transportation of riders with disabilities, including transporting service animals. Uber specially instructs its drivers on accessibility for riders with disabilities.

44. The general public recognizes Uber as a common carrier. The phrase "Ubering" has become a term-of-art meaning summoning a vehicle to get from point A to B.[7]

**B. Cherno Ceesay Died Because of Uber's Failure to Use Its Knowledge, Superior Resources, and Technological Capabilities to Protect Him from the Foreseeable Assault.**

45. On the evening of December 13, 2020, Cherno Ceesay was driving for Uber in Issaquah, Washington. He was using a car which met all of Uber's safety requirements, which he rented from Hertz through Uber's Vehicle Marketplace program. None of the cars available from the Uber Vehicle

---

[7] Multiple courts and state regulatory agencies have recognized Uber's status as a common carrier, even though Uber has attempted to disclaim itself as such. The U.S. District Court for the Northern District of California held that Uber is a common carrier. *See Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016) ("Plaintiffs' allegations support the claim that Uber 'offers to the public to carry persons,' thereby bringing it within California's definition of common carrier for tort purposes."). In April of 2018, The California Public Utilities Commission found that Uber was both a transportation network company and a charter party carrier. Similarly, in 2014, the City of Seattle passed an ordinance regulating transportation network drivers as it would other common carriers.

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 10

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

Marketplace contained any safety devices to protect the driver from his or her passengers.

46. At 8:50 p.m., Olivia Bebic and Devin Wade created an Uber account under the name Stephanie Tylor and email address plutowade@gmail.com. No one by the name of Stephanie Tylor exists in Washington State and the name was made up for the purpose of hiding the identity of the person creating the account. Bebic and Wade set up the Uber account with an unverified form of payment. Had Uber done any screening or background check at all, it would have found that Stephanie Tylor did not exist, and the account was created with an unverified form of payment.

47. Just thirteen minutes after creating the account, at 9:03 p.m., Bebic and Wade used the new Uber account with the fake name to request a ride for a destination two miles away. Uber's app directed the request to nearby Mr. Ceesay, who accepted it and arrived at the pick-up location at 9:18 p.m.

48. Moments after Mr. Ceesay picked the pair up, Bebic and/or Wade, sitting in the back seat of the car, used a knife to attack Mr. Ceesay from behind, stabbing him in the neck and head.

49. Mr. Ceesay did not lose consciousness immediately but was alive and conscious for at least several seconds before succumbing.

50. The Hertz car, which he was operating at the time of the attack, then travelled a few hundred yards, stopping when it crashed into a tree. At approximately 9:25 p.m., Mr. Ceesay's lifeless body was discovered in the driver's seat of his car, with multiple stab wounds to his neck. He was still wearing his seatbelt. Mr. Ceesay's cell phone was later found to be stolen by Bebic and Wade.

51. At 11:54 p.m., the plutowade@gmail.com email address received an email from Uber stating the credit card payment had failed for the Uber ride with Mr. Ceesay.

52. The police picked up Bebic and Wade at Factoria Mall in Bellevue, Washington, on December 15, 2020, in connection with Mr. Ceesay's death.

53. Despite Uber's knowledge that its drivers, including Cherno Ceesay, are at high risk of passenger assault, especially at night, and its knowledge of measures and technologies that could save drivers' lives, Uber did nothing to protect Mr. Ceesay. Uber did not warn Mr. Ceesay of the risks or train him to identify particularly dangerous situations or people, did not install or require a surveillance camera

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 11

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

or a physical barrier between driver and passenger in Mr. Ceesay's Uber-approved-and-provided rental car, and took no steps to screen or verify the identity of passenger accounts. Nor did Uber inform Mr. Ceesay that Uber did not adequately screen new customers, or otherwise use its data collection and analysis technology to protect drivers from danger.

54. These simple and effective measures—all readily available to Uber—could have saved Mr. Ceesay's life.

### C.     Uber's Terms and Conditions.

#### 1.     Drivers Are Not Required to Read the Terms and Conditions of the App.

55. The following facts pertain to all relevant times to this matter—including when Mr. Ceesay became an Uber driver in or around 2016.

56. When a prospective driver signs up for Uber's services, he is required to create an account online prior to gaining access to the app. While online, he is prompted to enter his name, an email, a mobile number, and a password.

57. After creating the account, a hyperlink is made available in the app to the "Technology Services Agreement." Notably, there is no requirement to click on the hyperlink. Instead, a prospective driver must click a "YES, I AGREE" button at the bottom of the screen to continue. Uber does not include the terms of the "Technology Services Agreement" in the app at any point during the creation of a driver account other than the hyperlink.

58. While a prospective driver cannot pass the initial screen unless he selects the "YES, I AGREE" button, Uber does not require the driver to click to read its terms and conditions or even prompt the driver by automatically pulling up the Terms and Condition screen.

59. The full text of the Terms and Conditions is never provided to the prospective driver during the process of signing up for an account or before they are compelled to click the "YES, I AGREE" button.

60. During the account creation process, the prospective driver can only view the terms and conditions by clicking through an optional link or by logging on to his profile online outside the app to click on the aforementioned link.

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 12

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

61. Once the account is created, to access the Terms and Conditions within the app, a driver is required to click first on a menu button, sift through multiple pages and links in order to find a "Legal" link under the menu sidebar.

62. Once in the "Legal" section, a driver can access some version of Uber's Terms and Conditions hidden amongst over forty other "Terms and Conditions" options.

63. After a prospective driver is compelled to click the various "YES, I AGREE" buttons, he is prompted to enter how he would like to earn with Uber—delivery by car, scooter, bicycle, or foot.

64. On the final screen, he is prompted to enter more information to set up an account, including his photograph, driver's license, vehicle insurance, vehicle registration, and enough information for Uber to perform a background check.

### 2. Drivers Were Not Provided a Meaningful Opportunity to Agree to the Updated Terms and Conditions.

65. At no point did Mr. Ceesay agree to Uber's updated Terms and Conditions.

66. Every year, Uber notifies its drivers that the Terms and Conditions have been updated.

67. Uber's Terms and Conditions have been included in various contractual documents since its inception. These contractual documents include but are not limited to the "Partner Agreement," "Terms of Service," and "Technology Services Agreement."

68. Prior to Mr. Ceesay's death, Uber created a new contractual document to serve as the Terms and Conditions for its drivers. These updated Terms and Conditions were included in Uber's "Platform Access Agreement" on January 6, 2020. The "Platform Access Agreement" serves as a contract between Uber and its drivers and contains the relevant terms and conditions.

69. When Uber updates its terms and conditions in the Platform Access Agreement, it sends a notification to its drivers through the Uber app.

70. When Uber drivers receive the notification, they are only provided an option to click "YES, I AGREE" to the updated terms. Similar to prospective drivers, drivers who receive notification that the terms and conditions have been updated are not automatically prompted with a screen that contains the

First Amended Complaint for Wrongful Death and Survivorship - 13

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

Terms and Conditions for their review. However, unlike the initial application, drivers are not even provided a link in the app to review the updated terms and conditions.

71. Instead, drivers need to log in to their driver profile outside the app and separately review the 20-page document.

72. Drivers' accounts are frozen and they are unable to accept new rides until they have "agreed" to the updated terms in the Platform Access Agreement.

73. A driver who is not in a position to log in to his or her online profile—someone set to start driving—cannot review and analyze the new terms he or she is forced to agree to if the driver does not want his or her account to be frozen.

74. This system is problematic for drivers as they do not have a meaningful opportunity to access their online profile and continue to operate their motor vehicle.

75. Drivers are provided the choice of blindly accepting Uber's new Terms and Conditions or suspending their operations to review a voluminous, difficult to understand document that is not provided within their driver app.

76. At no point prior to December 13, 2020, was Mr. Ceesay required to open a link to the Terms and Conditions in the Platform Access Agreement.

77. The Terms and Conditions in the initial application to which a prospective driver in the United States would be bound have an arbitration provision that, upon a recent revision of the terms and conditions, is now highlighted in the first section, but has previously been buried as far down as numbered item 6—"Dispute Resolution."

78. When viewing the Terms and Conditions in the app, a user must scroll through approximately seven (7) full pages of microscopic text to reach the "Dispute Resolution" provision.

**3.    Because Mr. Ceesay Never Assented to the Terms and Conditions, They are Not Binding.**

79. Based on the foregoing, Mr. Ceesay was not provided conspicuous notice of the existence of alleged contract terms when he downloaded the app.

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 14

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

80. At all relevant times, Mr. Ceesay was not required to, and nor did he, review the Terms and Conditions of the app.

81. Similarly, Mr. Ceesay was not required to, and nor did he, click the link and review the provisions located within the "Platform Access Agreement."

82. While Mr. Ceesay was required to check a box that affirmed that he "agreed" to the Terms and Conditions when he downloaded the app, he was provided no meaningful opportunity to review terms and conditions.

83. Uber failed to properly notify its drivers, including Mr. Ceesay, when modifications were made to the Terms and Conditions. Through his continued use of the app, Mr. Ceesay was not required, nor did he affirmatively agree to the Terms and Conditions of the app.

### 4. Uber Retained the Right to Unilaterally Change the Terms and Conditions of the App.

84. At all relevant times, including when Mr. Ceesay downloaded the app, the Terms and Conditions contained language purporting to grant Uber the unilateral right to modify the agreement.

85. Pursuant to the Terms and Conditions, Uber provided itself with the exclusive ability to alter allegedly binding agreement terms and simultaneously removed any obligation to properly notify consumers regarding modifications.

86. In the Terms and Conditions, Uber requires arbitration for any claims that arise out of the use of the app. It excludes from arbitration claims any brought "to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights."

87. Upon information and belief, Uber's arbitration provision excludes the types of claims Uber is most likely to bring against others, while requiring arbitration for the types of claims most likely to be brought against Uber.

88. Recovery is also severely limited by Uber's Terms and Conditions.

89. According to the Terms and Conditions, Uber's liability for any and all damages and losses

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 15

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

incurred cannot exceed $500.

90. Uber's Business Model Requires a Large Pool of Drivers.

91. Uber's business model depends on having a large pool of both drivers and passengers, so that customers can secure rides in a matter of minutes. As such, the application process to become an Uber passenger is simple, fast, and designed to allow Uber to coordinate as many rides as possible while incurring minimal associated costs to screen those passengers.

## LIABILITY

92. Uber owed a duty of reasonable care to Cherno Ceesay, a designated Uber driver operating an Uber-approved car through Uber's proprietary Vehicle Marketplace and user of Uber's technology platform matching drivers and passengers for the benefit of Uber. Uber was negligent for at least the following actions and omissions: (a) by facilitating and approving the rental of a car through Uber's Vehicle Marketplace to Cherno Ceesay that lacked known, effective safety features such as a physical partition separating driver from passengers and/or a surveillance camera; (b) by failing to require Cherno Ceesay's car to be outfitted with known, effective safety features such as a physical partition separating driver from passengers and a surveillance camera; (c) by failing to warn Mr. Ceesay about the known risks of passenger assaults on drivers, especially at night, and to train him and/or inform him of simple steps he could take to protect himself against that risk, such as installing a partition and a surveillance camera; (d) by matching Mr. Ceesay with people using fake identities and an unverified form of payment; (e) by failing to employ its data collection and analysis capabilities to screen out potentially dangerous new customers using fake and fraudulently obtained information to create their Uber account; and (f) by making it difficult and costly for Uber drivers to reject passengers based on safety concerns.

93. Uber's negligence is also established by the fact that as a common carrier it: (a) failed "to promote the safety, health, comfort, and convenience of its patrons, employees, and the public" (RCW 81.28.010); (b) failed to ensure driver safety pursuant to WAC 480-30-221; 49 CFR § 396.3(a)(1); and (c) caused or permitted a prohibited, forbidden or unlawful act to be done, and/or omitted to do a required act (*see* RCW 81.04.440).

94. As a direct and proximate result of Uber's negligence, Cherno Ceesay was stabbed to death in the back of his neck, in his Uber-approved rental car, by Uber customers Bebic and Wade, who created a brand new account with an unverified form of payment that did not match their fake name and contact information. Mr. Ceesay experienced great physical pain and extreme mental anguish as he bled from his stab wounds and lost control of his car before he died.

95. As a direct and proximate result of the wrongful death of Mr. Ceesay, his family, Amie Drammeh; Yusupha Ceesay; Maram Ceesay; Kodou Ceesay; Yamundow Jobarteh; and Baboucarr Ceesay, lost their son and brother, and together with the Estate have sustained significant economic and non-economic damages.

## V.     DAMAGES

96. Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

97. Under Washington choice of law principles, a court may permit a jury to award punitive damages under another state's law. *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 210 P.3d 337 (2009). Defendants are citizens of California. Because Uber committed intentional wanton, willful, and outrageous acts without justification or acted with reckless disregard for the rights and interests of others, California is interested in punishing and deterring such conduct. Therefore, Uber is liable for punitive damages under California law.

98. Plaintiffs are entitled to all compensatory damages authorized under the law, including but not limited to:

    A. Damages for the decedent's medical expenses; lost earning capacity; lost future earnings; interference with normal life; and past and future economic damages;

    B. Damages for the decedent's injuries, mental anguish and emotional distress, and physical pain and suffering before his death;

    C. Damages for the loss to all statutory beneficiaries of decedent's services and support, protection, advice, counsel, guidance, and love and companionship, in such amount as, under all the circumstances of the case, may be just;

    D. Funeral and burial expenses;

    E. For costs and disbursements;

    F. For statutory attorney fees;

    G. For special and general damages in amounts to be proven at trial;

    H. For prejudgment interest on the special damages; and

    I. For prejudgment interest on liquidated damages.

99. Plaintiffs seek all other rights and remedies available under the law.

100. All of the above damages are in an amount that will be proved at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

    A. For judgment against all Defendants for all general and special damages in amounts to be proven at the time of trial;

    B. For punitive damages under California law; and

    C. For such other and further relief as the Court may deem just and proper.

DATED this 25th day of March, 2021.

    WEINSTEIN CAGGIANO PLLC

    */s/ Alexandra Caggiano*
    */s/ Brian Weinstein*
    */s/ Dylan Johnson*
    Brian D. Weinstein, WSBA No. 24497
    Alexandra B. Caggiano, WSBA No. 47862
    Dylan Johnson, WSBA No. 54147
    600 University Street, Suite 1620
    Seattle, Washington 98101
    Telephone: (206) 508-7070

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 18

WEINSTEIN CAGGIANO PLLC
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

1

2

3

4

5

6

7

        Email: service@weinsteincaggiano.com
        Counsel for Plaintiff

        And

        CORRIE YACKULIC LAW PLLC
        Corrie J. Yackulic, WSBA No. 16063
        Larken Yackulic, CA Bar No. 323090
        110 Prefontaine Place S, Suite 304
        Seattle, WA 98104
        Telephone: (206) 787-1915
        Email: corrie@cjylaw.com
        Counsel for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

First Amended Complaint for Wrongful Death and Survivorship - 19

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650

# **CERTIFICATE OF SERVICE**

I hereby declare under penalty of perjury under the laws of the United States of America that on March 25, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the below listed counsel:

Weinstein Caggiano PLLC

*/s/ Mary Wingerson*
Mary Wingerson
Legal Assistant

| **Co-Counsel for Plaintiffs**<br>Corrie J. Yackulic, WSBA No. 16063<br>Larken Yackulic, CA Bar No. 323090<br>*Admitted Pro Hac Vice*<br>Corrie Yackulic Law PLLC<br>110 Prefontaine Place S, Suite 304<br>Seattle, WA 98104<br>Telephone: (206) 787-1915<br>Email: corrie@cjylaw.com<br>Email: larken@cjylaw.com | (  )<br>(  )<br>(  )<br>(  )<br>( X )<br>(  ) | Legal Messenger<br>Facsimile<br>U.S. Mail<br>Federal Express<br>E-Mail<br>Hand Deliver |
|---|---|---|
| **Counsel for Uber Technologies, Inc. and Rasier, LLC**<br>Gary A. Wolensky, WSBA #54454<br>Bradley P. Thoreson, WSBA #18190<br>1420 Fifth Avenue, Suite 3100<br>Seattle, WA 98101-1337<br>Telephone: 206.319.7052<br>Email: gwolensky@buchalter.com<br>Email: bthoreson@buchalter.com | (  )<br>(  )<br>(  )<br>(  )<br>( X )<br>(  ) | Legal Messenger<br>Facsimile<br>U.S. Mail<br>Federal Express<br>E-Mail<br>Hand Deliver |

FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 20

**WEINSTEIN CAGGIANO PLLC**
600 UNIVERSITY STREET, SUITE 1620
SEATTLE, WASHINGTON 98101
(206) 508-7070 - FACSIMILE (206) 237-8650