The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DRAMMEH, ET AL.,

        Plaintiffs,

     v.

UBER TECHNOLOGIES INC., ET AL.,

        Defendants.

Civil Action No. 2:21-cv-202-BJR

ORDER GRANTING PLAINTIFFS'
MOTION TO STRIKE OR SEVER THIRD-
PARTY COMPLAINT; DENYING MOTION
FOR STAY; GRANTING MOTION FOR
PROTECTIVE ORDER

## I.     INTRODUCTION

Plaintiffs Amie Drammeh and Yusuoha Ceesay, representing the estate of Cherno Ceesay ("Cherno") (collectively, "Plaintiffs") filed this lawsuit against defendants Uber Technologies, Inc. ("Uber") and Rasier LLC (together, "Defendants") alleging that Uber's negligence caused the wrongful death of Cherno, who was a driver for Uber and was killed by two passengers.[1] Dkt. No. 15. Defendants have filed a third-party complaint against the passengers that killed Cherno, Olivia Breanna-Lennon Bebic and Devin Kekoa Wade ("Third-Party Defendants"), alleging that they are

---

[1] The two passengers, referred to herein as Third-Party Defendants, have not been found guilty of this crime, and their criminal trial is in October.  However, for purposes of this Order, the Court will proceed as if the allegations against them are true.

obligated to indemnify Defendants if Plaintiffs' claims succeed, and therefore that their third-party claims should be tried together with Plaintiffs' claims against Defendants. *See* Dkt. No. 31. Before the Court is Plaintiffs' motion to strike or sever the third-party complaint (Dkt. No. 41), Defendants' motion to stay this case (Dkt. No. 33), and Defendants' motion for a protective order (Dkt. No. 35). Having reviewed the motions, the record of the case, and the relevant legal authorities, the Court will grant Plaintiffs' motion to strike or sever the third-party complaint, deny Defendants' motion for a stay, and grant Defendants' motion for a protective order. The reasoning for the Court's decision follows.

## II.    BACKGROUND

On December 13, 2020, Cherno, acting as a driver for Uber in and around Issaquah, Washington, received a ride request from an Uber account created by Third-Party Defendants. Dkt. No. 15 ¶¶ 1, 45. Although Third-Party Defendants allegedly fabricated the account and used an unverified form of payment, the Uber app nevertheless allowed them to request a ride. *Id.* ¶ 1. Cherno accepted the request and picked up Third-Party Defendants. *Id.* ¶ 47. While Cherno was driving them to their purported destination, Third-Party Defendants stabbed Cherno in the back of the neck, and the car veered off the road and hit a tree. *Id.* ¶¶ 47-50. Cherno died before emergency personnel arrived. *Id.* ¶ 50. Two days later, state police found and arrested Third-Party Defendants. *Id.* ¶ 52. Third-Party Defendants' criminal trial is set for October 18, 2021. Dkt. No. 33 at 2-3.

Plaintiffs allege that Uber was aware that its drivers were at high risk of assault and failed to take measures to prevent Cherno's murder. *See* Dkt. No. 15. Defendants answered and admitted that Cherno was an Uber driver using the Uber app, but denied that they were negligent. *See* Dkt. No. 46.

Plaintiffs did not sue Third-Party Defendants, but Defendants filed a third-party complaint impleading them. *See* Dkt. No. 31. Defendants claim that Third-Party Defendants must indemnify

them for any damages assessed against Defendants, based on theories of contribution, equitable indemnity, and contractual indemnity. *See id.* Plaintiffs moved to strike or sever the third-party claims, arguing that they are meritless and that their inclusion in the case would prejudice Plaintiffs and confuse the jury. *See* Dkt. No. 41.

It is the Court's understanding that no discovery has yet been produced in this case, because Defendants seek a protective order before sharing confidential commercial information with Plaintiffs. *See* Dkts. 35, 44. Additionally, Defendant's seek a stay of discovery until Third-Party Defendants' trial is complete. Dkt. No. 33. Defendants argue that they will not be able to take discovery from Third-Party Defendants before their trial, because they will invoke their Fifth Amendment right against self-incrimination. *Id.* at 4-5.

## III.    DISCUSSION

The Court will first address Plaintiffs' motion to strike or sever Defendants' third-party complaint.

## A.    Plaintiffs' Motion to Strike or Sever the Third-Party Complaint

Federal Rule of Civil Procedure 14, which governs third-party impleading, states that "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to for all or part of the claim against it." Fed. R. Civ. Pro. 14(a)(1). "The purpose of this rule is to promote judicial efficiency by eliminating the necessity for the defendant to bring a separate action against a third individual who may be secondarily or derivatively liable to the defendant for all or part of the plaintiff's original claim." *Southwest Admrs., Inc. v. Rozay's Transfer*, 791 F.2d 769, 777 (9th Cir. 1986) (citation omitted). The Court has discretion to strike a third-party complaint when "it will disadvantage the existing action." *Id.* (citation omitted). Furthermore, the third-party plaintiff must show that Third-Party Defendants "[are] or may be liable" for the claims brought against it. The Ninth Circuit has interpreted this to mean that "there

must . . . exist a substantive basis for the third-party defendant's liability." *Kim v. Fujikawa*, 871 F.2d 1427, 1434 (9th Cir. 1989). Therefore, in addition to considering the effect a third-party complaint would have on the existing action, the Court has the discretion to strike the complaint if it fails to state a claim.

Defendants' third-party claims are essentially three mechanisms for shifting liability to Third-Party Defendants: contribution, equitable indemnity, and contractual indemnity. Plaintiffs move to strike or sever all three claims. The Court addresses each claim in turn.

### 1. Contribution

Contribution is "the right of one who has paid a common liability to recover a portion of the payment from another tortfeasor who shares in that common liability." *Kottler v. State*, 963 P.2d 834, 837 (Wash. 1998). Defendants argue that they have a right of contribution against Third-Party Defendants, stating that the latter "are obligated to provide an equitable contribution to any judgment or settlement herein awarded in direct proportion to the amount of tortious conduct of each Third-Party Defendant." Dkt. No. 31, ¶¶ 25-26. Plaintiffs counter that, under Washington law, contribution is only available to "two or more persons who are jointly and severally liable." RCW 4.22.040(1); Dkt. No. 41 at 6. Furthermore, as Plaintiffs point out, Washington courts have made clear "that joint and several liability under RCW 4.22.070 applies only to damages caused by negligence and that negligent defendants may not apportion liability to intentional tortfeasors." *Rollins v. King Cnty Metro Transit*, 199 P.3d 499, 503 (Wash. Ct. App. 2009) (citation omitted). The Court finds that Plaintiffs are correct that, since Third-Party Defendants are intentional tortfeasors, Defendants have no claim for contribution against them. Intentional tortfeasors cannot be jointly and severally liable with Defendants.

Furthermore, under the statute, joint and several liability is generally not available in Washington, "unless a listed exception applies." *Id.* at 838-39; *see* RCW 4.22.070. Here,

Defendants do not argue or plead that any listed exception applies. Because they fail to allege a basis for joint and several liability, Defendants cannot claim a right a contribution against Third-Party Defendants.

### 2.      Equitable Indemnity

The doctrine of equitable indemnity allows a plaintiff to recover attorneys' fees from a defendant whose acts or omissions exposed the plaintiff to litigation. "The doctrine is referred to as the ABC Rule because of its three elements: (1) A acts wrongfully toward B, (2) that wrongful act 'exposes or involves B in litigation with C,' and (3) 'C was not connected with' A's 'wrongful act . . . toward B.'" *Porter v. Kirkendoll*, 449 P.3d 627, 636 (Wash. 2019) (quoting *Manning v. Loidhamer*, 538 P.2d 136, 138-39 (Wash. 1975)). Importantly, "Washington courts require an exceptionally close causal nexus between Party B's exposure to litigation and the wrongful act or omission by Party A." *Woodley v. Benson*, 901 P.2d 1070, 1073 (Wash. Ct. App. 1995). Namely, "[i]f Party A's conduct is *not the only cause* of Party B's involvement in the litigation, and particularly if Party B's own conduct contributed to Party B's exposure in the litigation, an action [for equitable indemnity] will not lie." *Id.* (emphasis added).

Here, Defendants assert that A (Third-Party Defendants) acted wrongfully toward B (Defendants) by creating a fraudulent account in the Uber app, and that this act exposed Defendants to litigation with C (Plaintiffs). *See* Dkt. No. 48 at 7-8. However, Defendants third-party complaint does not contain any allegations that would establish that Third-Party Defendants' fraudulent use of the Uber app was the *only* cause of Defendants' exposure to litigation. *See* Dkt. No. 31 ¶¶ 18-24.

Furthermore, no reasonable jury could find that Defendants were exposed to this litigation solely because Third-Party Defendants created a fake Uber account. Such a finding would necessarily require a determination that Third-Party Defendants' *murder* of Cherno had no part in

causing Defendants' exposure to this *wrongful death* action.  No reasonable jury could find that to be true.  Additionally, Defendants' claim for equitably indemnity cannot be predicated on the act of murdering Cherno, because that was an act committed by A (Third-Party Defendants) against C (Plaintiffs), not against B (Defendants).  Therefore, Defendants cannot plausibly state a claim for equitable indemnity, and the Court strikes that claim.

### 3.    *Contractual Indemnity*

Defendants' final theory of liability, contractual indemnity, rests on a provision in Uber's Terms of Service contract, which users must accept before using the Uber app, that reads:

> You agree to indemnify and hold Uber and its affiliates and their officers, directors, employees, and agents harmless from any and all claims, demands, losses, liabilities, and expenses (including attorneys' fees), arising out of or in connection with: (i) your use of the Services or services or goods obtained through your use of the Services; (ii) your breach or violation of any of these Terms; (iii) Uber's use of your User Content; or (iv) your violation of the rights of any third party, including Third Party Providers

Dkt. No. 31 ¶ 9.  Plaintiffs argue (1) that the provision is insufficiently clear to indemnify Uber against its own negligence, and (2) that, even if the provision does purport to indemnify Uber, it is void as against public policy.[2]  *See* Dkt. No. 41 at 11-14; Dkt. No. 52 at 6-8.  The Court will address these arguments in turn.

---

[2] Plaintiffs also argue that Defendants' contractual indemnity claim is not ripe, because Defendants have not made any payment to Plaintiffs in the form of a settlement or an award of damages. *Central Wash. Refrigeration, Inc. v. Barbee*, 946 P.2d 760, 764-65 ("It is settled law that indemnity actions accrue when the party seeking indemnity pays or is legally adjudged obligated to pay damages to a third party.").  However, the Court agrees with Defendants that, as a general matter, unripe indemnity claims may be brought against third-party defendants in the same action as the underlying claim against which a third-party plaintiff seeks indemnification, if impleading is in line with Rule 14's goal of judicial efficiency.  *See* Dkt. No. 48, at 6-7.

a.    *Uber's Indemnification Provision Covers Injuries Caused by Its Own Negligence.*

Plaintiffs argue that Uber's indemnification provision should not be read to include the company's own negligence because the provision "does not expressly and unequivocally commit the customer to indemnify Uber for losses resulting from Uber's own negligent acts." Dkt. No. 52 at 7. However, an indemnification provision need not use the word "negligence" to be clear and unequivocal. *See id.* at 837; *Scott v. Pacific West Mountain Resort*, 834 P.2d 6, 9-10 (Wash. 1992) ("[M]any courts have held that clear and unambiguous exculpatory language can eliminate negligence liability without expressly using the word 'negligence.' . . . We agree."). Furthermore, Plaintiffs do not cite case law supporting their interpretation of the language in the Uber contract. In *Scott*, a case Plaintiffs rely on elsewhere, the Washington Supreme Court held that an indemnification provision purporting to "'hold harmless . . . from all claims' logically include[d] negligent conduct." *Scott*, 834 P.2d at 10. Similarly, Uber's provision states that users agree to "indemnify and hold Uber . . . harmless from any and all claims, demands, losses, liabilities, and expenses" arising out of their use of Uber's services. Dkt. No. 31 ¶ 9. Accordingly, the Court finds that Uber's indemnification provision covers injuries resulting from its own negligence.

b.    *Uber's Indemnification Provision Is Subject to the Same Public Policy Standard as an Exculpatory Clause.*

Plaintiffs argue that, if the provision in Uber' Terms of Service is read to indemnify Uber for its own negligence, then the provision would be akin to an exculpatory clause. Exculpatory clauses are invalid as against public policy if the six factors set forth in *Wagenblast* are present:

> [T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics.  [1] It concerns a business of a type generally thought suitable for public regulation.  [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.  [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.  [4] As a result

of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.  [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.  [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Wagenblast v. Odessa Sch. Dist.*, 758 P.2d 968, 971 (Wash. 1988) (citation omitted).

Defendants' primary response is that indemnification provisions are distinct from exculpatory clauses, and thus these six factors should not be applied.  Dkt. No. 48 at 4-6. Defendants attempt to distinguish the case on which Plaintiffs most heavily rely, *Scott*, by arguing that "[i]n holding that the exculpatory clause was valid, the court rejected the plaintiffs' attempt to argue that the 'hold harmless' language means that the provision was an indemnity clause and not an exculpatory clause." *Id.* at 5.  Defendants' interpretation attempts to bypass the explicit language of *Scott* downplaying any distinction between exculpatory and indemnification provisions. Specifically, the *Scott* court stated that, "although there is a distinction in definition between exculpatory clauses and indemnity clauses, in these settings they both attempt to shift ultimate responsibility for negligence and so are generally construed by the same principles of law." *Scott*, 758 P.2d at 10.

The relevant provision in Uber's Terms of Service contains both the word "indemnify" and the term "hold harmless," indicating that the same provision is intended to both indemnify and exculpate.  Thus, the contract itself recognizes an equivalence between these two concepts. Moreover, an indemnification clause would have the same practical effect as an exculpatory clause in this context.  As explained in *Scott*, "[a]n exculpatory clause purports to deny an injured party the right to recover damages from the person negligently causing the injury. An indemnification clause attempts to shift responsibility for the payment of damages to someone other than the

8

negligent party, usually back to the injured party, thus likely producing the same result as an exculpatory clause." *Id.* Based on this analysis, and the lack of any other relevant support for Defendants' position, the Court finds that Uber's indemnification provision is subject to the public policy analysis set forth in *Wagenblast*.

        c.     *Conducting a Public Policy Analysis of Uber's Indemnification Provision Would Be Inappropriate at This Stage.*

Although the Court has determined that Uber's indemnification clause should be scrutinized under the *Wagenblast* factors, the Court lacks sufficient information to apply those factors at this stage. The *Wagenblast* analysis calls for the Court to determine the nature of transactions between Uber and its customers and the characteristics of the service Uber provides to the public. Currently, the facts germane to this analysis are disputed by the parties. For example, in their Answer, Defendants deny the allegation that "Uber offers to carry and transport members of the general public and holds itself out to the public as an on-demand form of transportation available to anyone who wants to use it." *See* Dkts. 15 ¶ 35; 46 ¶ 35. Defendants similarly deny that Uber functions like a taxi service. *See* Dkts. 15 ¶ 36; 46 ¶ 36. Defendants admit only that Uber's app is "available to the general public to download . . . and that neither independent drivers nor riders are charged a fee to download [the app]." Dkt. No. 46 ¶ 38.

In essence, the parties dispute whether Uber is a transportation company, akin to a taxi service, or whether it is a technology company that connects independent drivers to customers but does not itself provide transportation. *See* Dkt. No. 46 at 12 ("Uber is a technology company and not a transportation company."). The Court cannot determine, for the purpose of a public policy analysis, whether the service Uber provides is essential to the public without first determining what that service is and how it is provided. That determination, however, cannot be made based on the facts currently before the Court.

1

2

### 4.       *Defendants' Third-Party Claim Is Likely to Confuse the Jury and Disadvantage the Existing Action.*

Plaintiffs argue that, regardless of whether Defendants' third-party claims are found to be meritless, the Court should nevertheless strike or sever them because including them would place Plaintiffs at a disadvantage in the existing action.  Dkt. No. 52 at 8-10.  Plaintiffs' overarching argument is that "[Defendants'] true purpose in trying to implead [Third-Party Defendants] is to confuse the issues and jury, and to delay litigation." *Id.* at 10.  Plaintiffs reason that "Uber's claims against [Third-Party Defendants] 'are of a different character' than Plaintiffs' negligence claims against Uber." *Id.*  Whereas Plaintiffs' claims focus on Uber's relationship with its drivers, Defendants' claims depend on the company's relationship with its passengers.[3]  Dkt. No. 52 at 8 (citation omitted).

Rather than dispute this characterization of the issues presented by Plaintiffs' complaint and the third-party complaint, Defendants argue that striking their third-party complaint is "premature" because nothing is yet being presented to a jury, that there is some factual overlap between their claims and Plaintiffs', and that it is more efficient to decide these common questions of fact in a single action.  Dkt. No. 48 at 12-13.

The Court agrees with Plaintiffs. The third-party claims present entirely different issues. Rather than achieving efficiency, keeping the third-party claims in this action would unduly complicate discovery and trial.  Most importantly, presenting Defendants' third-party claims would run the risk of confusing the jury.  Defendants last remaining third-party claim (contractual

---

[3] The Court notes that other "[c]ourts [have] especially disapproved of third-party claims asserted against parties who are plainly judgment-proof" (Dkt. No. 52 at 9), *see, e.g.*, *Valdez v. Farmington*, 580 F. Supp. 19, 21 (D.N.M. 1984) (court may refuse impleader where third party is, "in reality, a 'strawman defendant,'" and impleader "is simply a litigation tactic"), a fact which is abundantly clear in the case before the Court.

indemnity) is a contract claim against Uber passengers.  Plaintiffs' complaint brings tort claims on behalf of an Uber driver.  There is an obvious risk that a jury would not fully understand the separation between the two claims and would instead assume that they were being asked to decide, between Uber or Third-Party Defendants, who was more responsible for Cherno's death, which would be a misapprehension of the nature of this case and would prejudice Plaintiffs' action.  It is far more appropriate for Defendants to bring their claims in a separate action.  The Court will sever Defendants contractual indemnity claim against Third-Party Defendants from this action.[4]

**B.      Defendants' Motion for a Protective Order**

Defendants have moved for a protective order shielding its discovery responses that include "confidential, proprietary and/or commercially-sensitive information" from public disclosure.  *See* Dkt. No. 35.  Defendants request that the protective order cover, among other things, documents related to its financial condition and revenue, copies of settlement agreements and insurance policies, and incident reports from Uber's "independent drivers."  *Id.* at 6-8.  In drafting their proposed protective order, Defendants largely adhered to the Western District of Washington's Model Stipulated Protective Order.  Defendants made two modifications to the Model Protective Order: first, they added language to the effect that sanctions for discovery practices are appropriate only "after the party has had a reasonable opportunity to cure any prohibited designation."  Dkt. No. 50 at 8; second, Defendants added a requirement that Plaintiffs make challenges to Defendants' confidentiality designations within 30 days of the designation.  *Id.* at 9.

---

[4] Likewise, Defendants' claim for a declaratory judgment as to "the respective liabilities of [Defendants] and Third-Party Defendants for such damages [claimed by Plaintiffs]" (Dkt. No. 31 ¶ 33) would essentially ask the jury to apportion fault between Defendants and Third-Party Defendants as though they are all defendants to Plaintiffs' claims, when in fact Third-Party Defendants are not.  Therefore, the Court will sever the claim for declaratory judgment because it is likely to confuse the jury.

Federal Rule of Civil Procedure 26(c)(1) empowers the Court to issue a protective order shielding a party's discovery responses from public disclosure when the party demonstrates "good cause." Fed R. Civ. P. 26(c)(1). In demonstrating good cause, the moving party must point to a "specific prejudice or harm [that] will result if no protective order is granted." *Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002). The Rule specifically authorizes protective orders that "requir[e] that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed R. Civ. P. 26(c)(1)(G).

Defendants have convincingly demonstrated that many of their discovery responses will contain proprietary information about how the Uber app functions, Uber's financial condition, and Uber's business dealings. *See* Dkt. No. 35 at 6-8. Plaintiffs' arguments in response are largely misplaced. For example, Plaintiffs contend that "[b]y law, Plaintiffs are entitled to Uber's insurance policies." *Id.* at 10. However, Defendants are not seeking to withhold any insurance or other information from Plaintiffs; their protective order simply shields that information from public view. Similarly, Plaintiffs argue that "Uber is not entitled to an 'Attorneys' Eyes Only' (AEO) protective order," but Defendants are not seeking an AEO designation for any documents, and they explicitly disclaim that practice. *See* Dkt. No. 35 at 13 n.4. Plaintiffs also argue more generally that the proposed protective order is too broad and will cover virtually everything Uber produces. *See* Dkt. No. 44 at 11-12. However, the protective order will not deprive Plaintiffs of any of the information produced, and nowhere do Plaintiffs explain why the *public* would be prejudiced by not being able to access Uber's discovery disclosures. Furthermore, Plaintiffs are free to challenge Defendants' designations, and Defendants could be subject to sanctions if they are found to be abusing the protective order.

Accordingly, the Court hereby grants Defendants' motion for a protective order, including the modifications Defendants made to the Model Protective Order, which the Court finds reasonable.

## C.     Defendants' Motion for a Stay

Defendants seek an order staying this case until after Third-Party Defendants' trial in their criminal case, which is set to begin on October 18, 2021.  Dkt. No. 33 at 2, 8.  Defendants argue that discovery in this case necessarily involves seeking written responses or taking the depositions of Third-Party Defendants, and that doing so before their criminal trial could violate Third-Party Defendants' Fifth Amendment rights against self-incrimination.  *Id.* at 4-6.  Furthermore, Defendants contend that, if Third-Party Defendants invoke their Fifth Amendment rights and do not respond to discovery requests, Defendants will be "unable to meaningfully conduct discovery on [Third-Party Defendants]." *Id.* at 7.  In support, Defendants cite numerous cases in which courts stayed civil proceedings until a parallel criminal case concluded.  *See id.* at 4-6.

The Court acknowledges that, to the extent discovery from Third-Party Defendants is necessary in this case, Fifth Amendment concerns could arise and hamper discovery.  However, as Plaintiffs point out (*see* Dkt. No. 43 at 6), the bulk of discovery in this case does not concern Third-Party Defendants, and there is no reason why that discovery should be stayed until October.  The Court has granted Defendants' protective order, and Defendants are now obligated to begin responding to Plaintiffs' requests.  If the parties encounter difficulty in seeking discovery from Third-Party Defendants, then the parties should simply arrange to take discovery from them after

1   their trial is complete.[5]  Therefore, the Court finds that a stay is not warranted, and discovery should

2   proceed.

3                                        **IV.   CONCLUSION**

4           For the foregoing reasons, Defendants' motion for a protective order (Dkt. No. 35) is

5   HEREBY GRANTED.   Defendants' motion for a stay (Dkt. No. 33) is HEREBY DENIED.

6   Plaintiffs' motion to strike or sever the third-party complaint (Dkt. No. 41) is HEREBY

7   GRANTED.  The Court hereby strikes Defendants' contribution and equitable indemnity claims

8   and severs Defendants' contractual indemnity and declaratory judgment claims.

9           Dated this 18th day of August 2021.

10

11

12

13                                        _____
                                          Hon. Barbara J. Rothstein
14                                        United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26   _____
     [5] The Court recognizes that the discovery period in this case closes on October 20, 2021, two days
     after Third-Party Defendants' trial.  If the parties need to extend that deadline or take depositions
27   outside of the discovery period, they may make a request to that effect at the appropriate time.

14