UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMIE DRAMMEH and YUSUPHA CEESAY, Individually, as Surviving Parents of CHERNO CEESAY; and MARAM CEESAY, Personal Representative of the Estate of CHERNO CEESAY,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC., a Delaware Corporation, RASIER LLC, and THE FIRST DOE THROUGH ONE HUNDREDTH DOE, INCLUSIVE,

Defendants.

No. 2:21-202 BJR

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendants Uber Technologies, Inc. and Rasier, LLC ("Uber") argue primarily that Uber had no responsibility under the common law to exercise ordinary care—*to take any steps at all*—to protect its drivers, such as Decedent Cherno Ceesay, from criminal activity. Uber argues in effect that it owed no more duty to reduce the risk of harm to Mr. Ceesay than it owed to a total stranger. Uber's position is not only abhorrent as a matter of basic morality; it is manifestly unsupported by Washington tort law. Uber ignores the undisputed evidence of Uber's *exclusive control* over the very features of its rideshare platform that it failed to employ to protect its drivers,



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

including Mr. Ceesay, from its customers intent on doing harm. Uber also ignores the evidence contained in Uber's own database (but ignored until 2021) of a "staggering" increase in carjackings against rideshare drivers that began almost immediately after the March 2020 pandemic shutdown.[1] As Uber knows, the police determined that the underlying motivation for the assault on Mr. Ceesay was carjacking: "Bebic and Wade attempted to rob Cherno Ceesay of his Kia Sportage when he responded to their request for an Uber ride. During the course of this attempt, they caused his death by stabbing him."[2]

Uber's strategy is to insist that Washington law imposes a duty to protect Mr. Ceesay from criminal activity only if Mr. Ceesay was in a specifically and inflexibly defined "special relationship" with Uber; to deny that Mr. Ceesay was in any such relationship with Uber; and to characterize its conduct causing injury as "nonfeasance" rather than an affirmative act of negligence. But each prong of Uber's strategy is flawed. Under Washington law, the duty to exercise ordinary care is far broader than Uber suggests. Washington Supreme Court decisions confirm that Uber, which had total control over all material aspects of its Drivers' work, including verification of customers' identification and in-app notification to customers when Drivers had Uber-registered dashcams, was in the type of relationship with Mr. Ceesay that required Uber to exercise ordinary care. And Washington courts have not hesitated to recognize an actor's duty to

---

[1] Uber tries to erect a case that ignores the facts and Plaintiffs' evidence, and on that basis argues for summary judgment. For example, Uber never once acknowledges that Mr. Ceesay was killed in a carjacking that went bad, even though Uber knows that is what happened. Uber repeatedly characterizes the incident as a "random" "assault" because it wants to deflect focus away from its own data that shows rideshare driver carjackings were anything but "random" in December 2020. *See* MSJ at 2. Similarly, Uber misleadingly insinuates that Plaintiffs' theory is based on Uber's failure to "vet" or "evaluate" the assailant-Riders. *E.g.*, MSJ at 16. Again, as Uber well knows because of the focus of discovery and expert testimony in this case, that is not Plaintiffs' claim at all. Rather, ***Plaintiffs contend Uber failed to verify the identity of Riders using an anonymous payment method*** (along with fake name and untraceable burner cell phone)—a red flag that even Uber subsequently acknowledged.

[2] Ex. 1, Information000008; Ex. 2, UTI0000191. All exhibits are to the Declaration of Corrie Yackulic in Opposition to Motion for Summary Judgment.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

exercise ordinary care to protect persons from foreseeable criminal activity when "logic, common sense, justice, policy, and precedent"[3] require.

Uber's contentions that the summary judgment evidence does not raise a genuine issue as to whether it breached its duty of ordinary care to Mr. Ceesay or whether its negligent conduct was a proximate cause of Mr. Ceesay's murder are equally meritless. The Washington Supreme Court has repeatedly stated that issues of breach and causation are ordinarily fact issues to be decided by juries. There is abundant evidence from which a jury could conclude that Uber acted negligently both in matching an anonymous user of its app with Mr. Ceesay and in failing to make available, require, or even simply advise its drivers to use, dashboard cameras (dashcams) integrated with the Uber app to eliminate the risk of criminal assault. The record also contains compelling evidence that the attack on Mr. Ceesay was foreseeable and the proximate result of Uber's negligence. By failing to acknowledge this event for what it was—a carjacking gone wrong—Uber manages to ignore the evidence in Uber's own data that carjackings by Riders whose identity Uber had not verified were entirely foreseeable at the time of the tragic event. Had Uber verified the identity of its Riders or encouraged dashcam use, and then notified assailants that they would be recorded on the dashcam, this tragedy would have never occurred. Rule 56 does not authorize summary judgment in Uber's favor. Its effort to avoid a jury trial should be denied.

## II. COUNTER-STATEMENT OF FACTS

### A. Uber is a For-Profit, Global Enterprise that Makes its Money by Matching Drivers with Whom It Contracts with Prospective Passengers Seeking Rides.

Uber is "a technology platform that uses a massive network, leading technology, operational

[3] MSJ at 10 (quoting *Centurion Props. v. Chicago Title Ins.*, 186 Wn.2d 58, 65 (2010).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

excellence and product expertise to power movement from point A to point B."[4] Its "massive, efficient and intelligent network consists of tens of millions of Drivers, consumers, Merchants, shippers and carriers."[5] Uber boasts it is "is one of the largest open platforms for [Drivers'] work in the world," operating in approximately 72 countries.[6] [redacted]

To attract Riders and Drivers, Uber has embarked on a safety-related public relations campaign. Uber claims it "embed[s] safety into everything we do" and pronounces itself as "the industry leader for safety."[8] Uber's "Code of Conduct" reassures that "people matter most to the Uber experience" and "[t]he safety of riders and drivers on the Uber platform is of utmost concern."[9] It asserts "even one critical safety incident is unacceptable . . ."[10]

At the time Cherno Ceesay began driving for Uber in July 2017, Uber boasted of its "commitment to drivers":



[11]

[4] Ex. 3, 2021 Annual Report at 4.
[5] *Id.* at 5.
[6] *Id.* at 9.
[7] Ex. 4, Deposition of FRCP 30(b)(6) designee, Shyrose Razwani, at 118:19–19:6.
[8] Ex. 3 (Annual report) at ii, "Our Values".
[9] Ex. 5, Uber's Code of Conduct at UTI 501. Uber claims it "maintains a **zero-tolerance policy** regarding all forms of discrimination, harassment, or abuse." *Id.* at 501, 522.
[10] Ex. 6, 2019 Safety Report at UTI000659; *see also* Ex. 7, "Launching New Rider Verification Feature" blogpost; Ex. 8, Hazelbaker NYT interview, Mar. 7, 2022.
[11] Ex. 10, July 1, 2017, https://web.archive.org/web/20170701105808/https://www.uber.com/drive/safety/; *see also* Ex. 11, Sept. 6, 2018, https://web.archive.org/web/20180908034154/https://www.uber.com/drive/ (same) ("all riders are verified with their personal information and phone number, so you'll know who you're picking up and so will we."). Uber reiterated that [redacted] in communications to Drivers, promising [redacted] Ex. 12, UTI 1311.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

As discussed *infra*, it is clear Uber never meant to keep its promises.

**B. Uber Allowed Olivia Bebic and/or Devin Wade to Create an Account Using a Fake Name with an Anonymous Payment Method, Then Matched Them with Its Driver, Decedent Cherno Ceesay. Moments After the Ride Began, Bebic and/or Wade Murdered Mr. Ceesay in what Law Enforcement Concluded was an Attempted Carjacking Gone Wrong.**

At the time of Mr. Ceesay's assault, assailants Olivia Bebic and Devin Wade were living out of their Nissan Altima in Factoria, with their two dogs, and driving for a food delivery app called "Chow Bus."[12] The brakes on their car wore out.[13] Being out of money or the means to earn money delivering food, Wade and Bebic formulated a plan to steal an Uber car,[14] which led to them creating an Uber account using the fake name Stephanie Tylor and the anonymous payment method described below. Data from Wade's phone and his cell phone provider records show he was in the area at the time of the assault.[15] Bebic and Wade went to great lengths to conceal their identities when signing up to use Uber.

At 7:06 PM PT on December 13, 2020, [redacted] At 8:50 PM PT, another Rider account was created under the fake name "Stephanie Tylor,"[17] [redacted].[18] The phone used to create both the Tylor and Bebic accounts was a prepaid cell phone (a

---

[12] Ex. 1, Information000005–8 (Certified copy of King County Information report); Ex. 13, IPD-000072, 74, 88–89 (Certified copy of Issaquah Police Report) Ex. 2, Issaquah Police Report at UTI 00068, 70, 83–84, 188–91 (Issaquah Police Report that Uber provided in discovery).

[13] Ex. 2, UTI 234–37.

[14] Ex. 1, Information000003, 8; Ex. 2, UTI 000191.

[15] Ex. 1, Information000007; Ex. 13, IPD-000073; Ex. 2, at UTI 000190, 69.

[16] Ex. 14, FRCP 30(b)(6) designee, Baker dep. at 79:2–81:12; Ex. 15, UTI 1008; Ex. 16, 1267–76. Uber's documents use Coordinated Universal Time (UTC). To avoid confusion, Plaintiffs use Pacific Time throughout this opposition.

[17] Ex. 14 (Baker, 81:13–25, 82:10-13); Ex. 17 (FRCP 30(b)(6) designee, Yeung 42:11–25); Ex. 18, UTI 1009; Ex. 19, UTI 1244–66; Ex. 20, UTI 71075–80, 71122.

[18] *Compare* n. 16 *with* n. 17 ([redacted]



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

"burner phone"), not registered to a named accountholder.[19] The Tylor Uber account was created with a prepaid Metabank gift card; the identity of such cardholders is anonymous and cannot be verified (unlike credit or debit cards, which are tied to a user's bank account).[20]

By 9:01 PM, the Tylor account requested an Uber "comfort car" ride with a pickup location on the rural Issaquah-Renton Highway and a drop off 1.9 miles away.[21] Uber paired the Tylor account with Mr. Ceesay for this ride.[22] Mr. Ceesay, when accepting the ride through Uber, had no way of knowing the Tylor account was brand new.[23] He arrived at the pick-up location at approximately 9:18 PM PT.[24] Around 9:25 PM PT, a nearby resident heard a crash and called police after discovering Mr. Ceesay in his car, unconscious, crashed into a tree.[25] Meanwhile, Bebic and Wade fled the scene, taking Mr. Ceesay's cell phone with them.[26] They apparently returned to their own car and, per the GPS data recorded on Mr. Ceesay's Uber app, drove the 11 miles or so, back to Factoria.[27] [redacted].[28]

The morning of December 14, 2020, Issaquah Police Department contacted Uber's Law

---

[19] Ex. 13, IPD-000103–04, 111, 122, 125–26; Ex. 2, UTI000098–99, 106, 117, 120–121, 204–07. This information pertains to the phone associated with the number (425) 800-7190, which is the phone number for Wade's phone that was used to open both accounts. Ex. 13, IPD-000089, 100–01, 106, 129; Ex. 2, UTI000084, 95–96, 111, 124, 207.

[20] Ex. 17 (Yeung, 52:22–53:12, 54:1–10, 54:22–55:10, 56:3–58:22, 59:18-20); Ex. 20, UTI 71122; Declaration of Annmarie Corrigan at ¶¶ 3–6.

[21] Ex. 14 (Baker, 95:24–96:7); Ex. 19, UTI 1244. [redacted] Ex. 14 (Baker, 95:24–16); Ex. 19, UTI 1244.

[22] Ex. 19, UTI 1244 [redacted] Ex. 20, UTI 71075–80; Ex. 14, (Baker, 85:1–8).

[23] Ex. 21 (FRCP 30(b)(6) designee, Sauerwein, 65:17–66:18).

[24] Ex. 22, UTI 72016 [redacted]).

[25] Ex. 1, Information000005; Ex. 2, UTI000088.

[26] Ex. 1,Information000005–8, Ex. 2, UTI000088–91

[27] Ex. 1, Information000006–8, Ex. 2, UTI000089–91.

[28] Ex. 22 at UTI 72016. [redacted] *Id.* at UTI 1257.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Enforcement Response Team (LERT) to request information about Mr. Ceesay's last ride for its investigation of his murder, indicating they believed that the rider was involved.[29] [redacted] The police tracked the phone to Bebic and Wade in Factoria.[31] The two were arrested on December 15, 2020.[32] They are currently awaiting trial.

### C. Uber Uses Its Negligent Lack of Rider Verification to Feign Ignorance Regarding the Identities of Its Riders Who Killed Mr. Ceesay.

Uber admits that "as of December 2020, Uber did not require identification documentation for riders at the time of sign-up."[33] Uber's negligent policy (a policy it changed in April 2021) allowed the unverified, anonymous, fake Tylor account to be paired with Mr. Ceesay for a ride on Uber's platform. It now pretends it does not know who created the Tylor account through its app ***because of its own negligent policy that did not verify identity***. [redacted][36]

---

[29] Ex. 14 (Baker, 90:8–91:3).
[30] Ex. 20, UTI 71122; Ex. 14 (Baker, 92:16–93:9).
[31] Ex. 1, Information000005–8; Ex. 2, UTI 188–91.
[32] Ex. 1, Information000006; Ex. 13, IPD-000074, 84; Ex. 2, UTI 70, 80, 141,189.
[33] Ex. 23, Uber's Responses & Objections to the First Set of Requests for Admission at RFAs 9–10; *see also* Ex. 24, Uber's Second Supplemental Responses & Objections to the 5th Set of Interrogatories, at Interrogatory Response 7.
[34] Ex. 14 (Baker, 83:24–86:1); Ex. 4 (Razwani, 82:4–20).
[35] Ex. 14, (Baker, 87:2–88:4); Ex. 25, UTI 499–500.
[36] Ex. 14, (Baker, 86:2–17) (emphasis added); *see also id.* at 83:24–88:4; Ex. 25, UTI 499–500.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Additionally, Uber identified the [redacted].[37] The police investigation revealed that no person named Stephanie Tylor lives in the state of Washington, even though the Tylor account registered a payment method using a Bellevue, Washington, zip code.[38] [redacted][39]

Moreover, on May 24, 2021, Uber filed a third party complaint against "Third-Party Defendants" Olivia Bebic and Devin Wade—a year before it decided on the strategy of denying knowledge of who killed Mr. Ceesay. Uber's third party complaint alleges that Bebic and Wade created an account on Uber's App to request a ride, which was accepted by Cherno Ceesay.[40] When asked whether Uber denies that Mr. Ceesay died during an attempted carjacking, [redacted]"[41]

**D. Uber Has The Right To Exercise Complete Control Over How Its Drivers Accepted and Conducted Rides in All Relevant Respects.**

Uber retains the right to prescribe almost all parameters of its Drivers' work:[42]

*1. Uber Controls Sign-up, Compensation, Driver Evaluation, Access to Customers, and Driver Termination, Among Other Terms & Conditions of Drivers' Work.*

Uber controls how to and who may become an Uber Driver A person becomes an Uber Driver by opening an Uber Driver account on his or her cellular device. This involves "agreeing"

[37] Ex. 20, UTI 71122; Ex. 14, (Baker, 92:16–93:9).
[38] Ex. 1, Information000008; Ex. 2, UTI 191. [redacted]. Ex. 14, (Baker, 101:24–02:20).
[39] Ex. 14 (Baker, 91:23–92:1).
[40] Docket No. 31.
[41] Ex. 14 (Baker, 115:9–23); *see also id.* at 102:10–20.
[42] As explained *infra*, the relevant inquiry is the "right of control," regardless of whether the defendant chooses to exercise that control. Here, Uber has an almost unfettered right to control the terms and conditions of Drivers' Work. *Vargas v. Inland Washington* LLC, 194 Wn.2d 720, 731-34, 1212-13 (452 P.3d 1205, 1212-13 (2019) ("'right to require use of safety precautions … was sufficient to establish [general contractor]'s duty'").



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

to terms and conditions set by Uber and providing Uber personal information including name, address, and drivers' license.[43]

Uber controls all aspects of hiring, overseeing, and terminating its Drivers:

1. Requires Drivers to undergo an annual criminal background check;[44]
2. Requires Drivers to complete a vehicle inspection;[45]
3. Requires Drivers to pass a city knowledge test and local regulations;[46]
4. Provides Drivers liability insurance; [47]
5. Controls Drivers' compensation;[48]
6. Evaluates Drivers based on customer star ratings and written feedback;[49]
7. Evaluates Drivers based on ride acceptance;[50]
8. Unilaterally resolves Rider and Driver complaints;[51]
9. Disciplines Drivers based on Uber's criteria;[52]

---

[43] Ex. 26, Platform Access Agreement (PAA), at UTI 472.

[44] *Id.*

[45] *Id.* at Section 2.5 and Ex. 27 (UTI 72102–14, [redacted]). In 2020, Drivers in King County had to have cars with four doors, be no more than 10 years old, in "good condition with no cosmetic damage," "in safe operating condition," have "no commercial branding," and pass a vehicle inspection test. *Id.*

[46] Uber enforces Seattle and King County requirements that Drivers complete the National Safety Council's Defensive Driving Course and a "Seattle City Knowledge Test." Docket No. 95-2, 95-3 (Sauerwein Dec., Exs. B, C (UTI 72101, 72100)). In King County, Uber also has Drivers view a 9:04-minute Uber-produced video on being an Uber Driver (required by local regulations). *See* Ex. 28, UTI 72115 (video).

Notably, none of these "trainings" provides any instruction or warning about the risks of passenger assault or gives Drivers any guidance on how to mitigate such risks. The sole focus of the NSC course is, as its name implies, "defensive driving" skills. The 12-question City Knowledge Test simply assesses knowledge of the local geography and destinations. The Uber-produced video side-steps any warnings or instruction to Drivers about the risk of assault by passengers. The *sole* reference to anything that even touches on Driver safety from passenger assault is the 10 seconds at 8:01-8:11 (alerting drivers that they can have items such as fire extinguishers). Ex. 28, UTI 72115.

[47] Uber provided Mr. Ceesay primary liability insurance of $1M for death and bodily injury claims arising from incidents that happened during a ride. Ex. 29 (UTI 489–98, Regulatory Fee Addendum, Seattle, WA at UTI 497); Ex. 21 (Sauerwein, 55:7–56:15).

[48] Uber dictates the presumptive or "default" fare for Drivers. Ex. 30, Technology Services Agreement (TSA) at UTI 450. Uber claims it allows Drivers flexibility on the fare collected, but such flexibility is a mirage. The TSA allows Drivers to "negotiate" a fare ***lower*** than Uber's "default fare," but it does not allow Drivers to charge a higher fare. *Id.* Query how a Driver is supposed to "negotiate" a lower fare than the default fare, when Uber collects the fare from the Rider via the pre-loaded payment method. The TSA is silent on this. Ex. 21 (Sauerwein, 48:16–25, 49:1–16).

Uber, not the Drivers, collects the fare from Uber's customers and then Uber takes its cut before paying Drivers their share. Ex. 30, Technology Services Agreement at UTI 451; Ex. 21 (Sauerwein, 52:3–21). Uber, and Uber alone, has the right to change the Fare Calculation "at any time in Uber's discretion." Ex. 30, Technology Services Agreement at UTI 451; Ex. 21 (Sauerwein, 50:9–22).

[49] Ex. 21 (Sauerwein, 59:7–60:18).

[50] Ex. 31, Quick Links and General Guidelines at UTI 512; Ex. 21 (Sauerwein, 60:12–61:8).

[51] Ex. 6, US Safety Report, 2017–2018, UTI000676.

[52] Ex. 21 (Sauerwein, 57:24–25, 58:1–6).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

10. Terminates Drivers based on Uber's criteria; [53] and

11. Collects, receives, evaluates, and responds to driver and rider reports of "safety incidents" (as defined by Uber). [54]

Uber also offers rental cars to Drivers through its "Uber Vehicle Marketplace." In Washington, Uber partners with Hertz. Uber does not equip these cars with any sort of safety equipment such as dashcams or Plexiglass shields. The Kia Sportage that Cherno Ceesay was driving on December 13, 2020, was rented through Uber's Vehicle Marketplace.[55] If a Driver does not have a cell phone, Uber will supply one along with a wireless plan, for a fee.[56]

Uber controls the pairing of Drivers with their customers. Uber forbids "street hails;" Drivers get their customers through Uber, ***and only through Uber***.[57] Once Uber pairs a Rider with a Driver, Uber tells the Driver where to pick up and drop off its customer. Uber controls ***all*** information Riders and Drivers get about each other.[58] Riders get a notification on their phone if the Driver's vehicle is equipped with a dashcam integrated with the Uber app.[59] *See infra.*

Uber forbids Drivers from taking "unauthorized stops" (as Uber defines them) while transporting customers.[60] Uber forbids Drivers from independently advertising their services as Uber Drivers.[61]

---

[53] Ex. 26 (PAA) at UTI 476.
[54] *See generally* Ex. 6 (US Safety Report, 2017–2018) UTI 000650-000733; *infra*, Section II.E.
[55] Ex. 21 (Sauerwein, 27:2–5).
[56] Ex. 30, (TSA) at UTI 448; Ex. 21, (Sauerwein, 27:22–28:15).
[57] Ex. 21 (Sauerwein, 32:6–15).
[58] Ex. 26, at UTI 472 (Platform Access Agreement).
[59] *See* Ex. 32, Screenshot, "Driver Has a Dashcam To Record Trips for Added Safety"; and *infra* (discussion re Uber's dashcam program).
[60] Ex. 21 (Sauerwein, 40:8-15); Ex. 26, Platform Access Agreement at UTI 472; Ex. 30, Technology Services Agreement, at UTI 446. Uber instructs Drivers to wait at least 10 minutes for a Rider "to show up at the requested pickup location." Ex. 21, (Sauerwein, 35:7–13); Ex. 30, Technology Services Agreement, at UTI 445.
[61] Ex. 26 Platform Access Agreement at UTI 473.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

*2. Uber **Alone** Controls Key Safety Features To Protect Drivers from Assault.*

Uber knows that putting strangers together in small mobile containers creates risk to those parties. ***Of the three parties to these transactions—Uber, Drivers and Riders—Uber is uniquely situated to manage those risks***. Two safety features exclusively within Uber's control are relevant to Plaintiffs' claims: dashcams and ID verification of Riders using anonymous payment methods.

a. <u>Uber Controls the Interface Between Riders and Drivers, Including the Dashcam Notification.</u>

Uber knows from pilot studies run since 2016, that dashcams deter Riders from assaulting or otherwise mistreating Drivers. Initially, Uber's sole focus was [redacted].[62] But Uber learned that [redacted].[64] Uber's [redacted].[65]

Because Uber is intent on preserving the fiction that its Drivers are entirely "free agents," independently making all decisions about their own safety, it does not provide dashcams to its

---

[62] Exs. 33–36 ([redacted], UTI 071886–1977).

[63] Uber found that [redacted]. Ex. 36, ([redacted], UTI 68121–45, at 68126).

[64] [redacted]); *accord* Ex. 37 ([redacted], UTI 68229–55, at 68247) ([redacted]"); Ex. 38 ([redacted], UTI 72305–402, at 72311) [redacted] (emphasis in original); Ex. 39 ([redacted]y, UTI 68016–51, at 68024) ("[redacted]); Ex. 40 ([redacted] UTI 68093–108, at 68105).

[65] *See, e.g.*, Ex. 41, ([redacted] UTI 71787-71797, at 71794); Ex. 42, ([redacted] UTI 71829–62, at 71831).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

[redacted].[67] Even though Uber found dashcams "[redacted],"[68] [redacted]. Why? [redacted]"[69] [redacted]

For Driver-owned dashcams linked to Uber's app, [redacted]."[72] That way, "[redacted]."[73] Uber Drivers whose dashcams are linked to the Uber app have ***no control*** over the contents of this in-app notice.[74] Likewise, Drivers whose dashcams are not integrated with Uber—for example, because Uber does not have a dashcam program in their area—have no way of putting a notification about the camera on the Rider's app or screen. Again, that is entirely within Uber's control.[75]

---

[66] Ex. 43, at UTI 71798–812, at 71804 (internal email among the Uber "dashcam team": "the employment challenge of Uber providing ***tools of the trade*** for drivers means that we can't just give them out for free, and drivers are required to pay for the dashcam") (emphasis supplied).
[67] Ex. 44 (Dashcam update, June 2020, reporting on study involving 5000 dashcams at a cost of $5/month, UTI 72226-72270). Drivers overwhelmingly report liking dashcams because it deters bad behavior by riders.
[68] Ex. 44 at UTI 72230.
[69] Ex. 44 at UTI 72247.
[70] Ex. 45 (Nov. 2020 proposal, UTI 71999–72013, at 72002).
[71] *Id.* at 72002.
[72] Ex. 45 (UTI 71999-72013, at 72012). [redacted] *Id.* at 72013; Ex. 32, Screenshot of "Driver Has A Dashcam to Record Trips for Added Safety"; Ex. 67 "[redacted]; Ex. 9 (FRCP 30(b)(6) designee 7/14/22, Freivogel, 250:10–51:5).
[73] Ex. 45 at UTI 72013.
[74] Ex. 21 (Sauerwein, 38:18–25, 39:1).
[75] Ex. 21, (Sauerwein, 36:18–25).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

b. Despite Claiming It Did Not Allow "Random" Persons on The Platform, Uber Allowed Riders To Open New Accounts Entirely Anonymously.

Uber has complete and exclusive control over who may open a Rider account and what information they must provide Uber to do so. Uber has the ability to access considerable personal information when a person opens a Rider account, including name, address, cell phone number and IP address, email address, and—where the Rider uploads a form of payment such as a credit or debit card—name and address verification through the bank account associated with that card. Uber has touted its ability to verify Rider identity as a safety feature: "all riders ***are verified*** with their personal information and phone number, so you'll know who you're picking up and so will we."[76] Moreover, Uber knows that [redacted][77]

Uber insinuates it performs a careful check of Riders at the time of signup.[78] The reality is to the contrary. As of December 13, 2020, a person could open a Rider account and order a ride ***completely anonymously.*** Uber itself acknowledged this in discovery: "As of December 2020 in the United States, Uber did not require identification documentation for riders at the time of sign-up."[79]

Not one of the "checks" Uber describes constitutes ***identify verification***. For a person using an "anonymous payment method"[80] Uber's process is meaningless because a person can

[76] Exs. 10, 11 (screenshots from Uber's website www.uber.com/drive); *accord* Ex. 12, UTI 1311 ("We are committed to your safety, Drive and earn with peace of mind, We provide: . . . Qualified riders, not random pick-ups, so you'll feel at ease").
[77] Ex. 46, at UTI 78500 ([redacted]).
[78] *See* MSJ at 4–5.
[79] Ex. 24, at 6 (Uber's 2nd Supp. Responses & Objections to Pltffs' Interrogatories, Set 5, No. 8, at 6); Ex. 23, (Uber's 1st Responses & Objections to Pltffs' Requests for Admission, RFAs 9–10, at 5–6); *accord* Ex. 46, UTI 78501 ([redacted].").
[80] Anonymous payment methods include [redacted] Ex. 46 (UTI 78364).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

falsify the personal information associated with the payment method without consequence.[81] Uber's Mastermind "rules engine," like all of Uber's "checks," was designed ***solely*** to screen out ***financial fraud against Uber***, not to protect Drivers from passengers with malicious intent.[82] If Uber's verification process had been as robust as it claims, then the fake Stephanie Tylor account should not have been able to get on the platform or request a ride.

Uber's insinuation here that its process was thorough is particularly disingenuous given that just weeks after Mr. Ceesay's murder, [redacted]"[83] That is because people using anonymous payment methods are "more often linked to malicious actions or fraud which can put drivers at risk." [84]

Similarly, Uber claims it forbids "duplicate accounts," that is, more than one account on the same cellular device.[85] But the "SMS OTP confirmation process" Uber touts as a security feature, *see* MSJ at 4, does not even verify the cellular device the account is opened on. The [redacted][86]

---

[81] Declaration of Annmarie Corrigan, ¶¶ 5, 9.
[82] *See* Corrigan Decl., ¶¶ 5–7; Ex. 47 (Zahra Asgari, 44:10–46:14, 49:4–50:20). Indeed, Zahra Asgari, whom Uber identified as "group product manager of Identity," and the lead on the Identity Team able to address Uber's internal tools for preventing "risk and potential fraud," could not even confirm whether Uber "wants to keep riders and drivers safe." As she stated, candidly: "I'm not part of that team." Ex. 47, (Asgari, 31:25–32:6).
[83] Ex. 46, at UTI 78489 ([redacted]).
[84] Ex. 7 (Uber blogpost, Apr. 9, 2021).
[85] *See* MSJ at 4 ("The Terms and Conditions limit each rider to a single account"); Ex. 48 (Fields, 41:7-10).[85] But as of December 2020 Uber did nothing to enforce this prohibition. *See, e.g.*, Ex. 49 ([redacted]); Ex. 50 ([redacted] UTI 63873).
[86] Ex. 4 (Razwani, 30:13–31:9); *accord id.* at 85:5–10.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

### E. Uber's Incident Reporting System: the "Cornerstone of Its Safety Program."

Uber insists its commitment to safety is paramount.[87] The "foundation of Uber's safety efforts" is "quality data," which is "immensely important" given the "serious nature" of the risks its Drivers (and Riders) are exposed to on the platform.[88] Without "quality data" on safety incidents, Uber cannot identify risks or trends and cannot "hold [itself] accountable to handling reported incidents responsibly."[89]

Uber's "Trust and Safety" agents document safety incident reports in an online fillable form called a "JIRA."[90] [redacted]

Despite Uber's awareness of [redacted]

[87] *E.g.*, Ex. 16, [redacted]

[88] Ex. 6 (2019 Safety Report, at UTI 682).

[89] *Id.* at UTI 656.

[90] *Id.*

[91] Ex. 52 (FRCP 30(b)(6) designee, McDonald, 23:11–24:1).

[92] *Id.* at 64:21–65:2; Ex. 53 UTI 72124 ([redacted]).

[93] Ex. 52 (McDonald, 21:14–15).

[94] *Id.* at 13:6–7.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

[redacted]

It was only after the Chicago Police Department contacted Uber in early 2021“about carjackings”[98] that Uber’s data science teams “looked into reported carjackings” of Uber cars.[99] [redacted]

[redacted]. 46, at UTI

---

[95] Ex. 46 ([redacted]”).

[96] Among the [redacted] Ex. 46 at UTI 78489, 78494 ([redacted]).

[97] Ex. 46 at UTI 78333. [redacted]

[98] Ex. 9 (Freivogel 6/22/22, 50:19–51:1, 53:5–11).

[99] *Id.* at 53:12–21.

[100] Ex. 52, (McDonald, 96:24–97:11). [redacted].” Yackulic Decl, ¶ 65 and Exhibit 62 thereto ([redacted]).

[101] Ex. 46, at UTI 78329.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

[redacted] months later Uber launched the new rider verification requirement for riders using prepaid/gift cards.[102]

### F. Uber's Incident Reports Document [redacted]

[redacted]

[redacted]

- [redacted]
- [redacted]
- [redacted].[106]

| | Q 1 | Q 2 | Q 3 | Q 4 |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[102] Ex. 7, Launching New Rider Verification Feature blogpost.

[103] For a variety of reasons, the data described above represent an undercount of carjackings against Uber Drivers. Uber produced incident reports for the period January 1, 2017–December 13, 2020. Uber did not produce reports for carjackings where the Driver was sexually assaulted. Uber did not produce reports where the assailant was a "Guest Rider," that is, a passenger other than the one who ordered the ride. Uber did not produce reports for incidents that were not coded a "serious interpersonal conflict." Yackulic Dec., ¶ 64. And as already noted, Drivers likely underreport serious incidents for a host of reasons.

[104] Yackulic Dec., ¶ 65 (Ex. 63, Table 1, Source: JIRAs produced by Uber).

[105] Yackulic Dec., ¶ 66 **(Ex. 70, Uber 2020 Annual Report).** Uber does not report ride volume on a monthly or quarterly basis so "gross bookings" for the rideshare business are used here to show the precipitous drop in the business after the shutdown.

[106] Yackulic Dec., ¶¶ 64-66; Ex. 63.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

[redacted]

**G. Breach of Duty: Uber Did Not Provide Mr. Ceesay Any Training, Instruction, or Warning Regarding The Risks of Assault or Inform Him Of The Efficacy of Dashcams In Deterring Crime, and Allowed Bebic and Wade on the Platform Anonymously and Without Verification.**

*1. Uber Failed to Provide Cherno Ceesay Any Training, Instruction, or Warning Regarding the Risks of Assault, Including The Deterrent Effect of Dashcams.*

Uber required Cherno Ceesay to undergo an annual criminal background check, to complete a driver safety course, to pass a "Seattle knowledge" test, and to watch a 9-minute video on what it means to be an Uber Driver.[113] But Uber gave Mr. Ceesay no instruction or warning whatsoever about the risks of rideshare driving, about red-flag situations or locations, or about how to mitigate such risks.[114]

---

[107] Ex. 46, at UTI 78494.
[108] *Id.* at UTI 78489.
[109] *Id.* at UTI 78494.
[110] *Id.*
[111] *Id.* at UTI078333, 78491.
[112] Data analysis is only as good as the inputs. [redacted].
[113] Ex. 28, (Seattle Driver-Partner Training Video), UTI 72115.
[114] Ex. 64, (Uber Supp. Responses to Interrogatory No. 4, Set 1) After lengthy objections to the Interrogatory, which asked Uber to describe "any and all training and/or instruction" it provided Cherno Ceesay, Uber responded as follows: ". . . Responding Party never employed Cherno Ceesay, Cherno Ceesay did not "work as an UBER DRIVER," and therefore **Responding Party never provided "training" or "instruction**." (emphasis added).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Uber knew dashcams deter crime and other "bad behavior" in rideshare cars—[redacted]

Thus, the only dashcam information Uber provided Cherno Ceesay was a page on the Driver app that ***discouraged*** dashcam use:

> [redacted]

Mr. Ceesay did not have a dashcam in his car on December 13, 2020.

*2. Uber Allowed The Assailants to Open an Account and Order a Ride With Complete Anonymity, Despite Its Promises to "Verify" Riders' Identity.*

As discussed *supra*, Bebic and Wade were able to open two accounts on the same phone within the space of less than two hours the evening of December 13, 2020, with a fake name, an untraceable cell phone, and a gift card.[118] Despite Uber's assurances to Drivers and the public that it verifies the identity of Riders it pairs with Drivers, in fact it was easy for Bebic and Wade to get on the platform anonymously.[119]

---

[115] Ex. 65, (UTI 71991); Ex. 39, (UTI 68016-68051, at UTI 68048): [redacted]); *accord* Rubino Dec., Ex. 1, at 11 (decals on cars announcing dash cams "significantly reduce the risk to drivers of assault, car-jacking"). See Docket 114-1, Ex. 1 to Rubino Dec. (filed July 22, 2022).

[116] Ex. 66, UTI 71813–25, at UTI 71817 ([redacted]

[117] Ex. 67, ("[redacted]?" UTI 67851).

[118] *Supra*, Section B; Ex. 4 (Razwani, 82:4–10.

[119] *See* Ex. 12, UTI 1311; Ex. 71, (2018.02.21 Uber Website, www.uber.com/drive).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

[redacted] were one reason for the surge in carjackings and other "malicious actions" in 2020.[120] People intent on committing fraud or malicious acts will use anonymous payment methods if they can get away with it.[121] [redacted].[122] Uber never should have allowed people to open accounts using prepaid/gift cards without verifying their identity.[123]

Moreover, [redacted].

**J. A Jury Could Easily Find Uber's Negligence was a Proximate Cause of Cherno Ceesay's Death.**

As Uber admits, people intent on committing "malicious acts" want anonymity.[124] That was clearly true of Bebic and Wade, who opened the Uber account with a made-up name, burner

---

120 *Accord* Ex. 7, Launching New Rider Verification Feature blogpost.
121 *Id.*
122 *Id.*
123 *See* Corrigan Dec.
124 *See*, *e.g.*, Ex. 7, (Launching New Rider Verification blogpost); Ex. 46, UTI 78327–513 ([redacted]).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

cell phone, and anonymous payment method and ordered the ride from a rural road, rather than from Factoria.

If Uber had required or encouraged drivers, including Cherno Ceesay, to use dashcams integrated with the Uber app, then Bebic and Wade would have ***received notification from Uber*** on their cell phone that their ride would be recorded "for your added safety."[125] Given their desire for anonymity, a jury could conclude that they would have declined the ride—just as Uber's own expert, Mark Lipian, MD, testified.[126]

For the same reason, if Uber had required Bebic and Wade to upload a government-issued ID to verify their identity—given their use of an anonymous form of payment (gift card)—they would not have been able to open the account with the fictitious name and Uber would not have put them in Mr. Ceesay's car. Uber's Dr. Lipian also conceded this point.[127]

## III. ARGUMENTS & AUTHORITY

### I. THE SUMMARY JUDGMENT STANDARD

The standard for issuing summary judgment is well known to the Court.[128] It is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[129] The court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.[130] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

---

[125] Ex. 32 (Screenshot "Driver Has a Dashcam to Record Trips for Added Safety); Ex. 9, (Freivogel, 7/14/22, 250:10–51:10).
[126] Ex. 68 (Lipian, 93:13–97:7).
[127] *Id.* at 85:10–17.
[128] *Primozich v. Oczkewicz*, No. C16-82 BJR, 2017 WL 77518, at *1 (W.D. Wash. Jan. 9, 2017).
[129] Fed.R.Civ.P. 56(c).
[130] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

functions, not those of a judge," *id.* at 255, and summary judgment should be granted only if the evidence is "so one-sided that one party must prevail as a matter of law."[131]

## II. ARGUMENT: THE RECORD CONTAINS AMPLE EVIDENCE OF EACH ELEMENT OF PLAINTIFFS' NEGLIGENCE CLAIM TO WITHSTAND SJ.

### A. Admissible Evidence Supports the Allegation that Bebic and Wade Killed Mr. Ceesay in a Botched Carjacking After Accepting a Ride Offered by Uber.

As a threshold matter, Uber asserts that Plaintiffs "failed to ever develop admissible evidence" establishing the contention that Bebic and Wade killed Mr. Ceesay in an attempt to steal his car.[132] The assertion is disingenuous and untrue. The official police report, produced by Uber in discovery (and part of which Uber filed in support of its motion to stay, Dkt. 34-1) and certified as authentic and bearing the trademark of the Issaquah Police Department, is admissible as a public record under FRE 803(8). This is true even though the report contains opinions and conclusions, which themselves are admissible.[133] In any event, at the summary judgment stage the court does not focus on the admissibility of the form of the evidence, but instead focuses on the admissibility of its contents.[134] "If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment."[135]

---

[131] *Id.* at 252.
[132] MSJ at 7.
[133] *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (holding admissible an investigative report prepared by the Judge Advocate General expressing an opinion on the probable cause of a military plane crash in a civil suit based on the crash).
[134] *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021).
[135] *Id.*; *see also Allstate Indem. Co. v. Lindquist*, No. C20-1508JLR, 2022 WL 1607925, at *8 (W.D. Wash. May 20, 2022) (because the reporting officer "could 'testify about the personal observations reflected in [their] official reports,'" a hearsay objection "provides 'no basis for excluding the objected-to documents in their entirety'" in considering the availability of summary judgment (quoting *Sandoval*, 985 F.3d at 666)).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Moreover, Uber itself felt confident enough in the conclusions of the police department and in the allegations in Plaintiff's First Amended Complaint that, bound by the strictures of FRCP 11, it filed a Third-Party Complaint against Bebic and Wade alleging that they had fatally assaulted Mr. Ceesay (Doc. 31). "Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them."[136] At a minimum, Uber's statements in its Third-Party Complaint constitute evidence that Bebic and Wade used the Uber App to obtain a ride with Mr. Ceesay and fatally assaulted him in his car.

Finally, [redacted].[138]

**B. DUTY: Under Washington Law, Uber Had a Duty to Protect Drivers with Whom It Contracted from the Foreseeable Risk of Criminal Harm Caused by the Use of the Uber App.**

Uber begins its duty analysis asserting that "there is no generalized duty of care owed by businesses to all injured parties."[139] But the Washington Supreme Court recently indicated that a proper duty analysis begins from precisely the opposite perspective: "At common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others."[140] The Restatement (Third) of Torts reflects this broad formulation of the duty to exercise ordinary care:

[136] *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Amended pleadings are no longer binding judicial admissions, but are instead evidentiary admissions, which may be introduced as evidence that may be explained or controverted by the party that made the admission. *Hassebrock v. Air & Liquid Sys. Corp.*, No. C-14-1835-RSM, 2016 WL 4496917, at *6 n. 13 (W.D. Wash. Apr. 11, 2016).

[137] Ex. 22, ([redacted]) UTI 72016. However, the investigator who created this JIRA *did* include a link to the Seattle Times article where Prosecutor Adrienne McCoy was quoted stating "[Bebic and Wade] stabbed him to death in the course of trying to steal his car." *Id.* at UTI 72106.

[138] Ex. 14, (Baker, 113:5–16:5).

[139] MSJ at 10 (citing *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 474 (1998)).

[140] *Mancini v. City of Tacoma*, 196 Wn.2d 864, 879 (2021) (quoting *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550 (2019)).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

> (a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.
>
> (b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.[141]

The Washington Supreme Court has emphasized that the determination of whether a defendant owed a duty of care to a plaintiff does not focus on nomenclature. In *Afoa v. Port of Seattle*, 176 Wn.2d 460 (2013), the plaintiff Afoa sued the Port of Seattle to recover damages for injuries sustained during his work at Sea-Tac Airport, which the Port owned and operated.[142] The Port sought summary judgment contending that it owed no duty to Afoa because he was neither an employee of the Port nor employed by an independent contractor of the Port but was merely a licensee.[143] The court responded that both the Washington worker-protection statute and Washington "common law reject reliance on formalistic labels and place the responsibility of protecting our state's workers on the entity best able to ensure workplace safety."[144] "[T]he relevant inquiry is whether the principal retained control over the work site, not whether there was a direct employment relationship between the parties."[145] The court found that in the summary judgment record "some facts suggest the Port retained very little control" while "other facts suggest the Port retained substantial control."[146] The court thus found summary judgment on the issue of duty unavailable.[147]

---

[141] Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010). The Washington Supreme Court has cited § 7 of the Third Restatement with approval. *Michaels v. CH2M Hill, Inc.*, 171 Wn.2d 587, 608 (2011).
[142] *Id.* at 464–65.
[143] *Id.* at 465–66.
[144] *Id.* at 480.
[145] *Id.*
[146] *Id.* at 474.
[147] *Id.* at 482.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

**1. Uber Controlled Mr. Ceesay's Working Environment, Including ID Requirements for New Riders and the Driver-Rider In-App Interface, and Thus Had a Duty to Protect Him from Foreseeable Risks Like Carjackings.**

Uber argues that a duty to protect another from the criminal acts of third parties exists under Washington law only when a "special relationship" as defined by the courts exists between the two parties.[148] Uber seizes on Plaintiffs' allegation that Mr. Ceesay was an independent contractor of Uber, not an employee, and implies that as an independent contractor Mr. Ceesay was not entitled to any protection from criminal assault by Uber.[149] Uber says that "Washington courts have never recognized a special relationship for the purposes of tort law between an app developer and an app user" and urges the Court to "be reticent to formulate any common law 'special relationship" not recognized or explicitly formulated by Washington case law or statute."[150]

Uber's argument fails because the Washington Supreme Court *has* "explicitly" recognized the duty of a company that contracts with a person to protect the person from safety hazards within the company's control. In *Vargas v. Inland Wash., LLC*, 194 Wn.2d 720 (2019), the Court acknowledged the general rule that one who engages an independent contractor is not liable for injuries to the employees of the independent contractor resulting from their work, but then cited the important exception to the rule: "when a general contractor engages a subcontractor and 'retains control over some part of the work,' the general contractor 'has a duty, within the scope of that control, to provide a safe place of work.'"[151] The Court further emphasized that "[t]he test of control is not the actual interference with the work of the subcontractor, but the right to exercise

[148] MSJ at 11.
[149] *Id.* at 12.
[150] *Id.* at 12 n. 7 (quoting *Buckley v. Santander Consumer USA, Inc.*, No. C17-5813-BHS, 2018 WL 1532671, at *6 (W.D. Wash. Mar. 29, 2018)).
[151] *Id.* at 731 (quoting *Kelley v. Howard S. Wright Constr. Co.* 90 Wn.2d 323, 330 (1978)).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

such control."[152] The defendant in *Vargas* denied that it exercised sufficient control over the workplace to establish to duty to protect the contractor from hazardous conditions, but the Supreme Court rejected the defendant's "cramped reading" of Washington law.[153] It reversed summary judgment in the defendant's favor, concluding that the defendant "could be directly liable for breaching its common law duty to maintain a safe workplace." [154]

Contrary to Uber's suggestion, the Washington Supreme Court has observed that the types of special relationships that warrant the imposition of a duty to protect a person from the criminal acts of another are not immutable and inflexible. For example, in *Niece v. Elmview Grp. Home*, 131 Wn.2d 39 (1997), the court recognized a special relationship between a group home and one of its disabled residents giving rise to the home's duty to exercise reasonable care to protect the resident from criminal sexual assault by one of the home's staff members, even though such a duty had not been previously recognized by the Washington courts. The court observed that "[m]any special relationships give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties," and gave as examples the relationships of school to student, carrier to its passenger, employer to employee, hospital to patient, and business establishment to customer.[155] The court noted that "[t]he special relationship which is most analogous to the relationship at issue

---

[152] *Id*. at 731 (quoting *Kelley*, 90 Wn.2d at 330-31).
[153] *Id*. at 733–34.
[154] *Id*. at 735. Uber's reliance on the absence of specific case law to support the existence of a special relationship between it, as an "app developer," and the people who contract with Uber to use the app in a manner controlled by Uber, is disingenuous. Uber's own evidence establishes that the company was only founded in 2009, and the technology giving rise to the relationship between rideshare providers and their drivers was unavailable before that date. Decl. of Peter Sauerwein, Docket No. 95, at 2; *see* Shu-Yi Oei, *The Trouble with Gig Talk: Choice of Narrative and the Worker Classification Fights*, 81 Law & Contemp. Probs., 107, 107 (2018) ("It is by now widely accepted that businesses such as Uber, Airbnb, Lyft, TaskRabbit, Rover, and DogVacay represent a new sector and way of providing goods and services."). The absence of caselaw applying clearly established Washington law to rideshare companies specifically is no reason to treat Uber differently than any other business entity that provides an independent contractor with a place to work.
[155] *Id.* at 44.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

here is the relationship between a hospital and its patients."[156] Relying on this analogy, the court found a special relationship between the group home and the resident imposing on the home the duty to protect the resident from criminal conduct "limited only by the concept of foreseeability."[157] The court concluded that "sexual assault by a staff member is not a legally unforeseeable harm," *id.*, and noted that the foreseeability of the particular assault on the resident "remains a question for the jury."[158]

More recently, the court recognized that the class of special relationships that impose a duty to protect others from criminal conduct includes the relationship between the Washington Department of Social and Health Services and foster children not within the Department's physical custody, even though that duty had not been specifically identified by the Washington courts.[159] In considering whether such a special relationship existed the court considered the statutory framework governing the relationship between the Department and foster children, Washington case law, and provisions in the Restatement (Second) of Torts relating to the duty to protect others from the conduct of third parties.[160] As in this case, the relevant statutes did not expressly impose a specific duty of care but were not inconsistent with recognition of such a duty under the common law.[161] The court then consulted Restatement (Second) of Torts § 315(b) (1965), which provides

---

[156] *Id.* at 44–45.
[157] *Id.* at 51.
[158] *Id.* at 51 n. 10.
[159] *H.B.H. v. State*, 192 Wn.2d 154 (2018).
[160] *Id.*
[161] *Id.* The Washington statutes at issue in *HBH* triggered the Department's duty to investigate only after it received a report that a child had been abused, which did not occur during the relevant time. *Id.* at 165 (citing RCW 26.44.050); *id.* at 160 ("DSHS did not obtain any information concerning abuse" during the time in question.). Thus, the court was constrained to consider whether the Department could be liable in tort under the common law. The Washington statutes governing rideshare companies are even less informative on their duties to the drivers with whom they contract. The relevant statute expressly disclaims any intent to classify rideshare drivers for the purpose of establishing liability. RCW § 51.04.0001(1) (West) ("The application of this chapter to a transportation network company, as defined in RCW 49.46.0001, shall not be indicative of, or considered a factor in determining, the existence of an employer-employee relationship between the transportation network company and driver for purposes of any other rights, benefits, or obligations under other state and local employment laws."). Thus, whether Mr. Ceesay is to be



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

"[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another *unless . . . a special relation exists between the actor and the other which gives the other a right to protection*."[162] The court concluded that the relationship between the state social welfare agency and the children it places in foster homes should be included among examples of § 315(b) protective special relationships. The Court rejected the Department's contention that a conclusion that a special dependent relationship exists between the Department and foster children not in its custodial care represents "an unprecedented expansion of [the] Court's § 315(b) doctrine."[163] The Court noted that "neither the Restatement nor relevant case law suggests that § 315(b) special relationships are confined to situations of physical custody or control."[164]

*H.B.H.* also rejects policy reasons of the type that Uber may (but to date has not) asserted to avoid imposition of a duty. The Court noted that recognition of a special relationship between the Department and foster children "will not lead to the unrestrained liability that the State and the dissent fear" because "the scope of its duty is circumscribed by standards of reasonable care."[165] Potential liability is further limited to risks that are foreseeable; "[i]ntentional or criminal conduct may not be foreseeable if it is 'so highly extraordinary or improbable as to be wholly beyond the

---

treated as a true independent contractor or as an employee *for the purpose of determining tort liability* is an issue for the courts to decide.

[162] 192 Wn.2d at 169 n. 5 (quoting § 315; emphasis added).

[163] *Id.* at 170 (quoting the Department's brief).

[164] *Id.* at 173. For this reason, among others, Uber's reliance on *Doe No. 1 v. Uber Technologies, Inc.*, 79 Cal. App.5th 410 (Cal. Ct. App. June 1, 2022) (Uber MSJ at 12-13) is misplaced. *Doe No. 1* involved a suit by women who had been lured into vehicles by assailants posing as Uber drivers and then abducted and sexually assaulted. The court held that Uber did not have a duty to protect the women from criminal acts by persons who were not in fact Uber drivers because they did not control the environments in which the assaults occurred. The court found the plaintiffs' analogy of Uber's duty to that of a premises owner inapt because a viable premises case governed by California law requires "a plaintiff physically on the defendant's property, creating at least an invitee-invitor special relationship." 79 Cal. App. 5th at 424. As *H.B.H.* makes unmistakably clear, the Washington cases involving duties arising from special relationships impose no such physical custody requirement.

[165] *Id.* at 176. The dissent complained that the court's "[f]oisting [a new] rule upon courts and parties by judicial fiat could lead to unforeseen consequences." *Id.* at 187 (Madsen, J., dissenting) (brackets in original).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

range of expectability.'"[166] Thus, "the State's duty is no broader than that of similarly situated private entities and concerns about limitless liability are without merit."[167]

Uber relies on its senior manager's assertion that Mr. Ceesay "had sole control of the means and manner in which he provided transportation services" to deny it exercised the type of control to warrant the imposition of a duty on protect Mr. Ceesay from third-party conduct.[168] The facts, as discussed above, directly and flatly contradict Uber's conclusory statement. Uber has sole and absolute control of whom Drivers are matched with--and then Uber heavily censors the information available to Drivers about their Riders and the ride details. Uber told Mr. Ceesay his rider was "Stephanie" and gave him "her" pickup location—but Uber did not communicate to Mr. Ceesay details Uber knew, including that (1) it had not verified the rider's identity, (2) the rider account had been opened just minutes before, and (3) the rider was using an anonymous payment method which is associated with criminal intent.[169] And under the terms and conditions of his contract with Uber, Mr. Ceesay had no discretion to decline to accept the anonymous payment method that Uber had authorized.[170] Additionally, Uber has created a system of perverse incentives and penalties to maximize total rides, such that any autonomy the driver might appear to have in this aspect of his work is illusory.[171]

Other courts have concluded that similar evidence raises a genuine factual dispute precluding summary judgment on the issue of whether Uber exercises sufficient control over its drivers to consider them employees (to whom a duty of care is owed) rather than independent

---

[166] *Id.* (quoting *Niece*, 131 Wn.2d at 50).
[167] *Id.*
[168] MSJ at 7 (citing Sauerwein Decl., ¶ 21).
[169] Ex. 21 (Sauerwein, 33:6–13, 66:15–18); Ex. 7, Launching New Rider Verification Feature blogpost.
[170] Ex. 21 (Sauerwein, 51:24–52:21, 66:15–18).
[171] *Id.* at 59:7–61:8, 64:19–66:18; Ex. 31 at UTI 000512.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

contractors.[172] As in those cases, the summary judgment evidence here establishes a genuine issue of fact as to whether Uber owed Mr. Ceesay a duty of reasonable care in matching him with and protecting him from passengers.

Uber finds the 23 year-old unpublished opinion of the Washington Court of Appeals in *Ngo v. Hearst Corp.*, 97 Wn. App. 1046, 1999 WL 760274 (1999) "instructive" because *Ngo* "involved identical issues raised in this action." MSJ at 10. But the suggestion that the facts of *Ngo* bear any meaningful resemblance to those of this case is fanciful. The plaintiff Ngo was shot and robbed by two assailants while delivering papers on his morning route in Central Seattle.[173] Ngo sued the two newspaper companies that contracted with him to deliver the papers, arguing he was effectively an employee of the companies and that Washington law required them to provide him with a safe place to work, and to warn him of the dangers of delivering newspapers in a high-crime neighborhood.[174] The companies assigned *Ngo* his route and identified the subscribers to whom he was to deliver papers.[175] But none of those subscribers committed the assault on *Ngo*; instead, random strangers in the neighborhood committed the criminal act. In contrast, the carjacking and murder in this case was committed by *the same persons to whom Uber provided the app and assigned Mr. Ceesay as the Driver*, persons from whom Uber purported to (but did not) collect detailed personal information. Uber did more than establish the route; it arranged the

---

[172] *See Razak v. Uber Techs, Inc.*, 951 F.3d 137, 146 (3d Cir. 2020), *cert. denied*, 141 S.Ct. 2629 (2021) ("Although both parties argue that there are genuine disputes regarding control, the facts adduced show otherwise."); *Narayanasamy v. Issa*, 435 F. Supp. 3d 388, 391–92 (D.R.I. 2020) (evidence that Uber controlled the finances, branding and marketing, and imposed requirements on drivers would allow a reasonable jury to find that Uber drivers were employees rather than independent contractors); *O'Connor v. Uber Techs., Inc.*, 82 F.Supp.3d 1133, 1153 (N.D. Cal. 2015), "disputed facts, including those pertaining to Uber's level of control over the 'manner and means' of Plaintiffs' performance," precluded summary judgment on the issue of whether Uber drivers were employees or independent contractors).

[173] *Ngo*, 1999 WL 760274 at *1.

[174] *Id.*

[175] *Id.* at *2.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

very intersection between Mr. Ceesay and the criminals that caused his death.[176] The facts of Ngo are so different from those here that even if the Court were to find *Ngo* good law (and it has been cited only once in its 23 years of existence), it does not compel or even inform the outcome of Uber's motion.

Nor do the cases from other jurisdictions Uber cites support its position that it owed Mr. Ceesay no duty whatsoever. In *Tchakounte v. Uber Technologies, Inc.*, Case No. CCB-20-3028, 2022 WL 326727 (D. Md. Feb. 2, 2022), Uber passenger Wilson murdered Uber driver Tchakounte and a fellow passenger after using the Uber app to obtain the ride.[177] Wilson was high on PCP at the time and had been convicted of a robbery 21 years before.[178] Mr. Tchakounte's survivors alleged that "Uber failed to exercise its duty of care *to* <u>*screen*</u> *passengers* like Wilson, leading to Mr. Tchakounte's murder."[179] More specifically, they argued that Uber "should have taken measures like screening its riders," just as it screens drivers."[180] The court declined to find a parallel "duty to screen riders," noting that recognizing such a duty "would open the door to a similar screening duty on taxi dispatchers or any other company that sends a service provider to a private shared space where there is some risk of interpersonal conflict or crime."[181] The court also found the particular assault committed by Mr. Wilson to be unforeseeable; "[n]othing in the record suggests that Uber would have reason to believe that Mr. Wilson had more than one violent offense, and that offense was from two decades prior."[182]

---

[176] *Supra*, Section B.
[177] *Ngo*, 1999 WL 760274 at *1.
[178] *Id.*
[179] *Id.* at *2 (emphasis added).
[180] *Id.* at *4.
[181] *Id.* at *8.
[182] *Id.* at *8.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

The policy reasons for declining to recognize the onerous duty the plaintiffs in *Tchakounte* sought to impose on Uber do not apply here. Most obviously, Plaintiffs do not argue Washington law imposes on Uber a duty to perform criminal background checks on its Riders, but only that Uber take simple steps that are not passenger-specific or otherwise burdensome, such as requiring ID verification for Riders using anonymous payment methods. As noted above, just weeks after Mr. Ceesay's death, [redacted],"[183] and added the ID verification requirement in April 2021 to plug this "[redacted]" in its process.[184] Moreover, while the particular risk of a specific passenger with a decades-old conviction committing a criminal assault may have been unforeseeable in *Tchakounte*, Uber knows its rideshare Drivers are "uniquely vulnerable" to carjackings ***and*** that "anonymous payment methods are more often linked to malicious actions, which can put Drivers at risk."[185] Even if the *Tchakounte* court reached the correct result in the case before it (and Plaintiffs do not concede it did), its reasoning does not dictate the result in this case.[186]

---

[183] Ex. 46, at UTI 78489 ([redacted]).

[184] For the same reason, the Nevada trial court's unpublished decision in Terry, II v. Raiser, LLC dba Uber, a foreign corporation, et al., Case No. A-20-814424-C (Clark County, Nev., May 5, 2022) (cited in MSJ at 21–22), is also inapposite.

[185] Ex. 7 (Launching New Rider Verification Feature blogpost). For this and a host of other reasons, the *Tchakounte* court's concern about the burden of a rider-***screening*** requirement on local taxi companies simply doesn't transfer to this case. Taxi companies employ different means of safeguarding drivers such as the use of plexiglass partitions and dashboard cameras; taxis bear conspicuous markings, distinctive paint jobs, and toplights, making them unlikely targets of carjackers. They would be unaffected by recognition of the ID Verification requirement at the time of Rider sign-up that Uber has now adopted for its platform.

[186] Another reason *Tchakounte* does not control the outcome here is that Maryland, unlike Washington, has not adopted § 302B of the Restatement (Second) of Torts. That section establishes a person's duty to protect a third-party from criminal conduct even absent a special relationship if the person's own misfeasance created the risk of criminal harm. *Compare Warr v. JMGC Group, LLC*, 70 A.2d 347, 359 (Md. 2013) (declining to recognize a duty under §302 of a bar owner to refuse to serve drunken patrons) with *Washburn v. City of Fed. Way*, 178 Wn.2d 732, 757-58 (2013) (recognizing that under §302B, a duty to protect against the criminal acts of third parties arises when the actor's own affirmative act has created the risk of such harm). In this case, Plaintiffs alleged and presented evidence that Uber acted affirmatively in matching Mr. Ceesay with riders whose identity was unverified. See Part V(B)(3) of this Opposition at 16-19. No such allegation or proof was presented in *Tchakounte*.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

**2. Uber's Adoption in 2021 of Identification Procedures to Avoid Putting Drivers at Risk Confirms the Existence of Its Duty to Protect Drivers.**

Uber's contention that it owed no duty to exercise ordinary care to protect drivers such as Cherno Ceesay from criminal assault (including the risk of carjacking) is undermined by its own "Responding to Carjacking" investigation in early 2021, resulting in adoption of the very policy change that would have prevented the incident resulting in Mr. Ceesay's murder.[187] On April 9, 2021, four months after Mr. Ceesay's murder, Uber published a blog post entitled "Launching New Verification Feature to Enhance Safety on the Road." Uber announced it would henceforth require persons opening a Rider account with an anonymous payment method to upload a "valid ID" which would then "undergo[] a serious of validity checks." Uber admitted "we know from law enforcement and other experts that **anonymous payment methods are more often linked to malicious actions or fraud which can put drivers at risk.** . . . we're strengthening our rider verification process and putting new safeguards in place to validate the identity of riders who use these [anonymous] types of payment."[188] These additional verification requirements "can act as a deterrent to those who are trying to use the app to cause harm."[189]

Should Uber argue that the ID requirement was adopted not to satisfy a legal duty but for public relations purposes, out of the goodness of its heart, or for some other reason, the Court should consider the legal consequences of Uber abandoning this new requirement. If criminal

[187] Ex. 46 ([redacted] at UTI 78489, [redacted]).

[188] Ex. 7 (Launching New Rider Verification Feature blogpost).

[189] *Id.* Uber may argue that evidence its adoption of this new procedure after Mr. Ceesay's death is a "subsequent remedial measure" inadmissible under Rule 407 of the Federal Rules of Evidence. But as the text of the rule itself states, "the court may admit this evidence for another purpose such as impeachment, or—if disputed—*proving ownership, control, or the feasibility of precautionary measures*." Fed. R. Evid. 407 (emphasis added). The drafters of the rule expressly recognized that such evidence is admissible to prove "existence of duty." Advisory Committee Note to 1972 Proposed Rules, Fed. R. Evid. 407; *see Hausman v. Holland Am. Line-USA*, No. 13-CV-00937 BJR, 2015 WL 11234151, at *3 n. 3 (W.D. Wash. Aug. 4, 2015) (admitting under Fed. R. Evid. 407 post-event e-mail to prove that the defendant had control over the area where injury occurred). The evidence is admissible on the issue of duty and indicates, if not confirms, that Uber had the duty to implement procedures for the safety of its drivers.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

assaults on drivers were to then increase, could Uber avoid liability by contending that, even though it may well have been negligent not to continue to require ID, it had no duty to protect drivers because no "special relationship" existed between them and Uber? The question itself suggests the absurdity of Uber's contention it owes no duty to protect its drivers from foreseeable criminal assaults by riders in the category Uber itself has identified.[190]

### 3. Uber's Own Affirmative Act in Pairing Riders Becic and Wade with Mr. Ceesay Exposed Mr. Ceesay to a "Recognizably High Degree of Risk of Harm" Through Criminal Misconduct; Thus, Uber Owed (and Breached) a Duty of Ordinary Care to Mr. Ceesay.

Uber contends Plaintiffs failed to allege or assert in discovery facts that would support a misfeasance theory (i.e., that Uber acted affirmatively to create a situation of peril).[191] Uber thus overlooks the very first paragraph of Plaintiffs' First Amended Complaint, in which Plaintiffs alleged that this case arises from the death of "Cherno Ceesay, a young Uber driver *whom Uber matched with two customers who opened their Uber account moments earlier* with fabricated personal information and an unverified form of payment."[192] Uber claims its negligence as alleged by Plaintiffs concern "*failures* to act (not evaluating riders, not providing various warning Mr. Ceesay [sic], and not requiring certain safety features)." However, "[t]he proper question is not whether an actor's failure to exercise reasonable care entails the commission or omission of a specific act. Instead, it is whether the actor's *entire conduct* created a risk of harm."[193] Here, Plaintiffs clearly alleged that Uber's act of matching riders Bebic and Wade with Mr. Ceesay—

---

[190] Uber's adoption of the identification policy also disproves its contention that recognition of a duty to protect drivers would violate public policy by "mak[ing] it more difficult for individuals to gain access to the Rider App" and will "most significantly affect . . . low income and minority and populations." MSJ at 14. Besides the shocking suggestion that Uber drivers are not worthy of non-burdensome protective measures against criminal assault, this "perverse effect" has already been visited on these populations by Uber's adoption of the identification policy. *Id.*

[191] MSJ at 15 (citing *Robb v. City of Seattle*, 176 Wn.2d 427, 429 (2013)).

[192] First Amended Complaint for Wrongful Death and Survivorship (Docket No. 15) at 1.

[193] Restatement (Third) of Torts: Physical and Emotional Harm § 37 cmt. (c) (2012) (emphasis added).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

without employing safeguards only Uber had the power to control--created the risk of the harm that took his life.

The Washington Supreme Court's opinion in *Washburn v. City of Federal Way*, 178 Wn.2d 732 (2013) demonstrates the need to look beyond the defendant's act of negligence in isolation and instead to view to the entire scope of its conduct in determining the existence of a duty to protect. In *Washburn*, the victim's boyfriend stabbed her to death hours after a city law enforcement officer served him with an antiharassment order obtained by the victim.[194] The victim's survivors sued the city claiming that the officer knew or should have known that service of the order would have caused the boyfriend to act violently.[195] The city argued that as a matter of law, it owed no duty to the victim because the case involved nonfeasance, not misfeasance.[196] The court noted that under Restatement (Second) of Torts § 302B, a duty to protect against the criminal acts of third parties even absent a special relationship "can arise where the actor's own affirmative act has created or exposed the other to a recognizably high degree of risk of harm through such misconduct.'"[197] The court acknowledged that "Washburn does tend to frame it in terms of a failure to perform" but reasoned that the failures alleged were only "a list of the ways [the officer] served the antiharassment order improperly."[198]

Similarly, Uber's allowing Bebic and Wade on the Uber platform using a gift card without requiring ID verification, its failure to give Mr. Ceesay the means to identify such risky riders, and its failure to provide, require or even encourage Mr. Ceesay to use a dashcam integrated with the Uber app, merely provides a list of the ways in which Uber affirmatively acted improperly. In

[194] *Id.* at 738–40.
[195] *Id.* at 740.
[196] *Id.* at 760.
[197] *Id.* at 757–58 (quoting § 302B, cmt. e).
[198] *Id.* at 760–71.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

undertaking to match riders Bebic and Wade with Mr. Ceesay, a transaction over which Uber exercised near absolute control, Uber had a duty "to act in a reasonable manner."[199]

Uber analogizes the facts in this case to those in *Robb*, in which the Washington Supreme Court held that the city owed no duty to the victim (Robb) of a murder because the city's officers did not affirmatively create a new risk that caused the murder to occur. But the facts in *Robb* are plainly distinguishable from those here. In *Robb*, an assailant (Behre) fatally shot Robb two hours after the police stopped Behre on suspicion of committing a burglary nearby.[200] During the stop, the officers observed shotgun shells on the ground, but did not question Behre about them or pick them up.[201] A witness later observed Behre retrieve the shells, after which he shot Mr. Robb.[202] Robb's widow claimed that the city had a duty to protect Robb from the fatal assault because it negligently failed to pick up the shotgun shells, which may have prevented the murder.[203] Adopting section 302B of the Restatement (Second) of Torts, the court recognized that a duty may arise to protect against the criminal acts of a third party but added that absent a special relationship the duty will be imposed only "where the actor's own affirmative act creates or exposes another to the recognizable high degree of risk of harm."[204] The court found that the officers did not affirmatively create a new risk when they stopped Behre and failed to pick up the nearby shells; "they did not provide the shells, nor did they give Behre the shotgun he used to kill Robb."[205] The court concluded that the officers' omission was "insufficient to impose a duty under §302B."[206]

---

[199] *Washburn*, 178 Wn.2d at 762.
[200] 176 Wn.2d at 430.
[201] *Id.*
[202] *Id.*
[203] *Id.* at 433.
[204] 176 Wn.2d 428–29 (citing Restatement (Second) of Torts § 302B, cmt. (e)).
[205] *Id.* at 439.
[206] *Id.*



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Unlike the officers in *Robb*, Uber *did* "provide the shells" and "gave Bebic and Wade the shotgun." Uber put persons it knew or should have known to be dangerous[207] into Mr. Ceesay's car.[208] Uber withheld from Mr. Ceesay information that would have enabled him to better protect himself. Uber also knew or should have known that Uber-driven vehicles, because they are privately owned and do not bear conspicuous identifying markings as do taxicabs, provide a particularly tempting target for would-be carjackers.[209] The reasoning and holding in *Robb* have no application in this case.

**4. Uber Has Failed to Demonstrate That the Attack on Ceesay Was Unforeseeable As a Matter of Law; The Evidence Upon Which Uber Relies Is Limited, Inconclusive, and Flawed, While the Record Contains Voluminous Evidence That the Attack Was Foreseeable.**

Uber contends that it owed Mr. Ceesay no duty to protect from Bebic's and Wade's criminal conduct because the conduct was unforeseeable.[210] It argues that "the *scope* of any duty owed is a question of law,"[211] and asserts that Washington law limits that duty only to foreseeable third-party conduct."[212] Actually, Uber has it backwards; the Washington Supreme Court has explained that "foreseeability can be a question of whether duty exists and also whether the harm is within the scope of duty owed. *In the latter sense, it is a question of fact for the jury*."[213]

---

[207] Uber's blogpost of April 9, 2021 (Ex. 7) proves beyond any reasonable doubt that it knew that persons like Bebic and Wade, who created Uber accounts with anonymous payment methods without proof of identification, posed a special risk of criminal assault to Uber drivers. Whether Uber should have known of the risk prior to the fatal assault on Mr. Ceesay is established by other evidence and is a fact issue precluding summary judgment. *See* Corrigan Dec., ¶¶ 6–8.
[208] Ex. 64 (Uber Supp. Responses to Interrogatory No. 4, Set 1).
[209] Ex. 69, (Rubino, 137:1–38:1, 164:4–65:24); Ex. 46 at UTI078329, 78493 ([redacted]); *see also* Restatement (Second) of Torts §302B, cmt. (e) (duty imposed where actor has brought into contact with the other a person who the actor knows or should know is likely to commit intentional misconduct "under circumstances which afford a peculiar opportunity or temptation for such misconduct.").
[210] MSJ at 20.
[211] *Id.* (emphasis in original)
[212] *Id.* (citing *Tortes v. King County*, 119 Wn. App.2d 1, 7–8 (2003) and *Nivens v. 7-11 Hagy's Corner*, 133 Wn.2d 192, 205 (1997)).
[213] *McKown v. Simon Property Group, Inc.* 182 Wn.2d 752, 764 (2015) (emphasis added).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Neither Uber nor the Washington courts have explained whether the analysis of foreseeability in determining duty differs from the analysis of foreseeability in determining scope of duty. The Washington Supreme Court has made clear, however, that "whether foreseeability is being considered from the standpoint of negligence or proximate cause, the pertinent inquiry is not whether the actual harm was of a *particular* kind which was expectable. Rather, the question is whether the actual harm fell within a *general* field of danger which should have been anticipated."[214] The court has also confirmed that "proving acts of similar violence is not the only way for a plaintiff to establish a duty . . . ."[215]

Uber implies that for an attack on one of its drivers to be reasonably foreseeable, it must have reason to suspect that a specific individual was likely to attack a specific driver.[216] But as the cases above demonstrate, to be foreseeable the actual harm need fall only within the *general field of danger* which should have been anticipated. If Uber's notion of foreseeability of criminal conduct were the law, liability could never be imposed for creating conditions facilitating criminal or tortious attacks by strangers. To be clear, this is not Washington law.[217]

Uber asserts "the assault on Mr. Ceesay was so random and unexpected that it was not foreseeable as a matter of law—and, consequently, outside the scope of the duty of care."[218] It characterizes the attack on Mr. Ceesay as a "fatal criminal assault," then claims (misleadingly)

---

[214] *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 288 (2021) (quoting *McLeod v. Grant County Sch. Dist. No.* 128, 42 Wn.2d 316, 320 (1953) (emphasis added).

[215] *McKown*, 182 Wn.2d at 770, 783 (Stephens, J., concurring) ("foreseeability may be established through a broad range of evidence.").

[216] MSJ at 21 (citing Ex. C to its Motion at p. 6, which it claims contains Plaintiffs' admission that Uber "had no way of anticipating that this particular assault would occur." Importantly, the "admission" cited by Uber actually states that "Plaintiffs admit Uber did not know this particular event would occur, *but Plaintiffs deny Uber was not aware that its drivers, including Mr. Ceesay, were at risk of assault by Uber customers using Uber's application.*" Alarcon Dec., Ex. C, Docket No. 94-3, at 7 (emphasis added).

[217] *See McKown*, 182 Wn.2d at 757 (attack by mass shooter at shopping mall could be foreseeable based on "past experience of prior similar acts").

[218] MSJ at 20.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

such an assault on an Uber Driver is less likely than selecting a Mega Millions ticket.[219] But Uber ignores that the criminal assault on Mr. Ceesay was not just a murder; it was a botched carjacking.[220] [redacted]”[227] In short, Uber’s own documents establish that it was foreseeable that Uber drivers would be carjacked—especially by Riders opening new accounts with entirely fake and untraceable information. This evidence precludes a conclusion as a matter of law that the assault on Mr. Ceesay was unforeseeable for the purpose of imposing a duty of ordinary care on Uber.

---

[219] MSJ at 23. For 2017–2018, there were approximately 900 **total** on-the-job homicides **throughout the United States**; whereas there were 7 who died working for Uber of that 900. Ex. 51 (Lennox, 56:15–57:13, 59:4–18). This means that Uber’s Drivers—even though they account for just a tiny fraction of the U.S. workforce—comprise nearly ***1% of the total number of job-related deaths in the United States.***

[220] In its motion, Uber avoids the use of any variation of the word “carjacking” for an important tactical reason. To refer to the fatal assault on Mr. Ceesay as a botched carjacking would concede a much greater likelihood that the assault was foreseeable.

[221] *Supra*, Section F (Source: [redacted]); Ex. 46 ([redacted] at UTI 78331–33, 78493.

[222] Ex. 14 (Baker, 43:19–22, 66:23–68:18); Ex. 53, [redacted] at UTI072118–26.

[223] Ex. 46, ([redacted]) UTI078333; Ex. 14 (Baker, 68:4–25, 70:7–74:19).

[224] Ex. 52 (McDonald, 96:22-23, 98:4-8, 98:15-99:25).

[225] Ex. 9 (Freivogel, 6/22/22, 56:4–10); Ex. 9 (Freivogel 7/14/22, 274:22–75:3).

[226] *E.g.*, Ex. 46 ([redacted]) at 78377, 78493.

[227] Ex. 46 ([redacted]), at 78500 (emphasis supplied).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

### C. BREACH: Uber Has Failed to Demonstrate as a Matter of Law That It Did Not Breach Its Duty of Ordinary Care to Cherno Ceesay.

It is axiomatic that while the existence of duty is a question of law, "breach and proximate cause are factual questions for a jury."[228] "Only when reasonable minds cannot differ may factual questions be determined as a matter of law."[229]

Uber asserts that its "undisputed facts" establish as a matter of law that "it acted reasonably under the circumstances," citing (1) its SMS verification (i.e., an exchange of text messages establishing that the rider physically possessed the phone on which she set up the account) and used its technology to evaluate payment information for "potential indicators of fraud;" (2) warned Mr. Ceesay about the risks of being a for-hire driver by providing him access with videos about driver risks, posting certain information on its website, and noting in its driver contract that it does not screen riders; and (3) it informed drivers (in a way undisclosed by Uber) of safety measures that they could take, including alarms and cameras). But none of these actions taken by Uber were intended to protect, or effective in protecting, Mr. Ceesay from foreseeable criminal attacks, including carjacking. The "rider verification" employed by Uber was only to ensure that Uber would get paid for providing the ride; it did not require the rider to verify his/her true identity. The "safety" videos merely provided information on defensive driving, how to navigate the airport and how to avoid traffic accidents. *See supra*, n. 45 (deconstructing the so-called training Uber required). The contract provisions that "warned" drivers Uber did not screen riders were buried in legalese in the multi-page documents that Uber required drivers to "sign" on their cellular devices.[230] And not one of the general suggestions on how drivers could protect their own safety

---

[228] *Whitford v. Mt. Baker Ski Area*, No. C-11-00112-RSM, 2012 WL 895383 (W.D. Wash. Mar. 15, 2012), at *2 (quoting *Hertog ex rel. S.A.H. v. City of Seattle*, 138 Wn.2d 265, 275 (1999).
[229] *Whitford*, 2012 WL 895383, at *2.
[230] *See* Exhibit E to Sauerwein Decl., Docket No. 95-5.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

amounted to action by Uber *itself* to fulfill its duty to protect its drivers. A reasonable jury could find that the Uber's evidence of what it *did* do--its act of matching the Stephanie Tylor account holder, as detailed above--with Mr. Ceesay was a breach of its duty of ordinary care.

Uber also suggests that its proof that no other rideshare company requires dashcams in its vehicles and the absence of any law or regulation requiring such protections conclusively demonstrates that its conduct was not negligent.[231] This suggestion flies in the face of the Washington Supreme Court's recognition that compliance with industry custom "does not establish the applicable standard of care as a matter of law."[232] Quoting Judge Learned Hand, the *Ranger Insurance* court observed that a defendant "never may set its own tests . . . Courts must in the end say what is required."[233] The very case cited by Uber on this issue noted that the defendant's "evidence of compliance can be used to counter [the plaintiff's] circumstantial evidence of a breach, but on summary judgment, it simply creates a material issue of fact.").[234] On the issue of whether Uber breached its duty to protect Mr. Ceesay from foreseeable criminal attacks, Uber's facts and arguments do not demonstrate the absence of a triable claim, and Plaintiffs' evidence confirms that the issue must be decided by a jury.

### D. Uber Has Failed to Demonstrate as a Matter of Law That Its Breach of Duty Was Not an Actual and Legal Cause of Cherno Ceesay's Death.

Uber's contention that the summary judgment record demonstrates the absence of a genuine dispute on the issue of actual causation should meet a similar fate. Uber dismisses the allegation that requiring that riders using an anonymous payment method provide proof of

---

[231] MSJ at 26.
[232] *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 554 (2008).
[233] *Id.* (quoting *T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932).
[234] *Walter Family Grain Growers, Inc. v. Foremost Pump and Well Servs.*, 21 Wn. App. 2d 451, 464 (2022) (cited in MSJ at 24).



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

identification as "pure speculation," MSJ at 28. Uber thus overlooks the testimony of its own expert that had Uber required rider ID verification or notified Riders of the presence of a dashcam, the assailants likely would never have entered Mr. Ceesay's car.[235]

The Washington Supreme Court has repeatedly rejected the contention that "requir[ing] the jury to reconstruct a causal chain" amounts to impermissible speculation; "crediting reasonable inferences is the stuff of juries, which is why courts generally leave questions of breach and causation for juries to decide."[236] In *H.B.H.*, the court concluded that the issue of whether the abuse of foster children would have continued had the state not negligently failed to perform health and safety checks had to be decided by a jury.[237] Similarly, in *C.B.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 727 (1999), the questions of whether the Church's negligent supervision of its deacon was a cause of sexual abuse inflicted on the plaintiffs and whether the harm was reasonably foreseeable were "questions of fact to be determined by the jury." And in a more recent case involving the failure to protect against sexual abuse, the court observed that "if the harm is one of the particular risks that made the defendant's conduct negligent, it is obviously a consequence for which the defendant must be held legally responsible, and it is not for the court to say that such negligence could not be a proximate cause."[238] As Uber's own authority demonstrates, a plaintiff "need not prove causation to an absolute certainty." *Walter*, 21 Wn. App.2d at 460. It is for the jury, not the Court, to decide whether Uber's negligent acts and omissions more probably than not caused the murder of Cherno Ceesay.

---

[235] Ex. 68 (Lipian, 93:13–97:7).
[236] *H.B.H. v. State*, 192 Wn.2d 154, 182 (2018).
[237] *Id.* at 182–83.
[238] *Meyers*, 197 Wn.2d at 294.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

Even if its negligence were a but-for cause of Mr. Ceesay's death, Uber asserts that it should be excused from liability because the incident was unforeseeable and thus its negligence was not a legal cause as a matter of law.[239] Quoting *Washburn v. City of Federal Way*, 178 Wn.2d 732, 761 (2013), it notes that "criminal acts are often unforeseeable and thus may break the chain of causation," MSJ at 28, and contents that, as a matter of law, the only cause of Mr. Ceesay's death "was the act of violence by alleged riders which Defendants could not have anticipated."[240]

But the court in *Washburn* also observed that "[c]riminal conduct is . . . not unforeseeable per se" and concluded that it was *not* unforeseeable as a matter of law in *that* case.[241] And although the court in *Tortes* found the criminal conduct unforeseeable, subsequent decisions by the Washington courts have limited result in *Tortes* to the facts of that case.[242]

In this case, as discussed above, Uber's own documents establish that trips with unverified anonymous Riders are "likely to result in rider-initiated carjackings"[243] a jury could easily find that the risk of the criminal assault committed on Mr. Ceesay was foreseeable to Uber. The decision on proximate cause should be left to the jury.

---

[239] MSJ at 28.

[240] *Id.* (quoting *Tortes v. King County*, 119 Wn. App. 1, 8 (2003) (brackets omitted)). Uber also repeats the falsehood that "Plaintiffs admit that Defendants had no way of anticipating Mr. Ceesay would be assaulted." MSJ at 28, citing Plaintiffs' response to requests for admissions. Plaintiffs admitted only that Uber did not know the identity of the perpetrators before the event, but expressly denied that Uber was unaware of the risk of criminal assault by riders on its drivers. Ex. C to Alarcon Decl., Docket No. 94-3, at 7.

[241] *Washburn*, 178 Wn.2d at 757.

[242] *See, e.g.*, *Steward-Baker v. County of King*, No. C-15-661-MJP, 2016 WL 1588380 (W.D. Wash. Apr. 19, 2016), at *5-*6 (*Tortes* "inapposite" because court "cannot conclude that the assault at issue in this case was unforeseeable to Defendant King County as a matter of law" even though plaintiff did not present evidence of prior similar assaults); *Brewster v. King County*, 164 Wn. App. 110 (2011), at *5 (*Tortes* "clearly distinguishable" because criminal conduct of drunk driver "unfortunately was all too foreseeable").

Uber's attempt late in its motion to characterize Bebic's and Wade's actions as a "superseding cause" (MSJ at 28 n. 19) does not change the analysis. As the Washington Supreme Court has noted, "only intervening acts which are not reasonably foreseeable are deemed superseding causes," and whether an act qualifies as a superseding cause "is generally a question of fact for the jury." *State v. Frohm*, 193 Wn.2d 590, 600 (2019).

[243] Ex. 46 at UTI 78500.



CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

## IV. CONCLUSION

The Court should deny Uber's motion for Summary Judgment in all respects.

DATED this 29th day of July, 2022.

Respectfully submitted,

Respectfully submitted,

CORRIE YACKULIC LAW PLLC
*/s/ Corrie J. Yackulic*________________
Corrie J. Yackulic, WSBA No. 16063
110 Prefontaine Place S, Suite 304
Seattle, WA 98104
Telephone: (206) 787-1915
Email: corrie@cjylaw.com

And

*/s/ Alexandra B. Caggiano*________________
WEINSTEIN CAGGIANO PLLC
Brian D. Weinstein, WSBA No. 24497
Alexandra B. Caggiano, WSBA No. 47862
Dylan Johnson, WSBA No. 54147
601 Union Street, Suite 2420
Seattle, Washington 98101
Telephone: (206) 508-7070
Email: service@weinsteincaggiano.com

And

*Brent Rosenthal*________________________
LAW OFFICES OF BRENT M. ROSENTHAL, PC
Brent Rosenthal, *Pro Hac Vice*
6617 Lakewood, Blvd.
Dallas, TX 75214
Telephone: (214) 679-1441
broselaw@gmail.com

Counsel for Plaintiffs