# EXHIBIT 9

**In the Matter Of:**

Drammeh

VS.

Uber, et al.

---

Cory Freivogel 30(b)(6)-CONFIDENTIAL

June 22, 2022

---



Moburg Reporting
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
(206) 622-3110
www.MoburgReporting.com

Drammeh v. Uber, et al.          6/22/2022   Cory Freivogel 30(b)(6)-CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
AMIE DRAMMEH and YUSUPHA CEESAY,  )
Individually, as Surviving        )
Parents of CHERNO CEESAY; and     )
MARAM CEESAY, Personal            )
Representative of the Estate of   )
CHERNO CEESAY;                    )
                                  )
             Plaintiffs,          )
                                  )
   vs.                            ) No. 2:21-cv-202
                                  )
UBER TECHNOLOGIES, INC., a        )
Delaware Corporation, RASIER      )
LLC, and THE FIRST DOE THROUGH    )
ONE HUNDREDTH DOE, INCLUSIVE,     )
                                  )
             Defendants.          )
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

Remote Videotaped Deposition Upon Oral Examination

of Defendant's FRCP 30(b)(6) Designee

CORY FREIVOGEL

"CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER"

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

9:30 A.M.

June 22, 2022

Chicago, Illinois

Valerie L. Seaton, RPR, CCR
License #2557

Drammeh v. Uber, et al.                    6/22/2022   Cory Freivogel 30(b)(6)-CONFIDENTIAL

```
                                                               Page 2
 1                REMOTE APPEARANCES VIA ZOOM

 2        FOR THE PLAINTIFFS:
                  ALEXANDRA B. CAGGIANO
 3                Attorney-at-Law
                  WEINSTEIN CAGGIANO PLLC
 4                601 Union Street
                  Suite 2420
 5                Seattle, Washington 98101
                  Alex@weinsteincaggiano.com
 6
          FOR THE DEFENDANTS:
 7                DAMION YOUNG
                  Attorney-at-Law
 8                BUCHALTER
                  1420 Fifth Avenue
 9                Suite 3100
                  Seattle, Washington 98101
10                Dyoung@buchalter.com

11        ALSO PRESENT:
                  YASI SEDGHANI
12                LEAH ALTMAN

13        THE COURT REPORTER AND VIDEOGRAPHER:
                  VALERIE L. SEATON, RPR, CCR
14                MARSHALL FOX
                  MOBURG REPORTING
15                33400 Ninth Avenue South
                  Suite 207
16                Federal Way, Washington 98003
                  Valerie@MoburgReporting.com
17

18

19

20

21

22

23

24

25
```

Page 50

1  research about riders who use anonymous payment methods?
2      A.   I don't believe we did any specific research into
3  anonymous payment methods.  I think that, as with all
4  safety incidents, we analyzed individual reports, looked at
5  trends over time, and used information received from
6  external sources to inform our decision-making.
7      Q.   So what -- what reports did you analyze regarding
8  the anonymous payment method change or that led to the
9  anonymous payment method change in policy at Uber?
10           MR. YOUNG:  Objection.  Vague and ambiguous.
11     A.   So I don't think there would have been any one
12  individual or small number of examples that would have
13  directly influenced the particular change.  I think you
14  used the phrase "led to," and I -- I would return to my
15  other answer which was, you know, various different factors
16  can influence policy decision-making internally, so...
17     Q.   (BY MS. CAGGIANO)  What other factors would
18  influence that policy making change?
19     A.   So similar to what I had mentioned previously, we
20  were engaged by law enforcement in early 2021 regarding
21  potential risk factors influencing carjackings.
22     Q.   So when law -- okay.  Let's start -- let's go
23  back a step.
24          Who from law enforcement engaged Uber?
25     A.   My understanding is that the Chicago Police

Drammeh v. Uber, et al.                6/22/2022   Cory Freivogel 30(b)(6)-CONFIDENTIAL

Page 51

1  Department had reached out to Uber in early 2021.
2      Q.   Any other law enforcement?
3      A.   Not that I'm aware of, but I'm -- they would have
4  engaged our Law Enforcement Response Team directly.
5      Q.   And the Law Enforcement Response Team, that
6  actually has some people who previously worked in law
7  enforcement; is that right?
8           MR. YOUNG:  Objection.  Calls for
9  speculation.
10     Q.   (BY MS. CAGGIANO)  Do you know?
11     A.   I -- I believe so.  I -- I'm not familiar with
12 all of their backgrounds, but yes.
13     Q.   So law enforcement in Chicago reached out to the
14 Law Enforcement Response Team at Uber, you think, in early
15 2021?
16     A.   Correct.
17     Q.   Did you ever speak with anyone from law
18 enforcement?
19     A.   I do not directly engage with law enforcement.
20 We have a team who would work with them directly.
21     Q.   What team is that?
22     A.   The Law Enforcement Response Team.
23     Q.   Got it.
24          Has the Law Enforcement Response Team ever
25 reached out to any law enforcement before 2021 to ask them

Drammeh v. Uber, et al.                6/22/2022   Cory Freivogel 30(b)(6)-CONFIDENTIAL

Page 53

1  the Law Enforcement Response Team had.  Generally, they
2  exist to engage with law enforcement, so I'm sure that
3  they've had conversations regarding driver safety broadly,
4  but I don't know the details of those conversations.
5      Q.    (BY MS. CAGGIANO)  And do you know what exactly
6  Chicago PD said to Uber's LERT team about carjackings and
7  why -- why it chose to reach out then?
8      A.    I'm not --
9            MR. YOUNG:  Objection.  Compound.
10     A.    So I do not know exactly what was said in those
11 conversations or why they reached out at that point.
12     Q.    (BY MS. CAGGIANO)  After law enforcement reached
13 out to Uber in 2021, did your team then do any sort of
14 research on or, I guess, related to the carjacking issue
15 that the law enforcement had raised?
16     A.    I believe we would have looked into reported
17 carjackings at that point, reviewing cases or kind of like
18 analyzing trends over time, and we had also done a bit of
19 work related to some of the guidelines or tips that I had
20 referred to previously that were provided by law
21 enforcement.
22     Q.    Are there any guidelines and tips reported from
23 law enforcement that Uber didn't -- has not communicated to
24 drivers?
25           MR. YOUNG:  Objection.  Calls for

Page 56

1  selecting that option in an individual JIRA, but I can't
2  speak to, you know, like, awareness of specific times when
3  that was a problem.
4       Q.   When you're doing your research, let's say you're
5  searching for carjackings through the JIRAs, you're only
6  going to be looking for -- are you only looking for JIRAs
7  that contain that vehicle theft subcategory?
8            MR. YOUNG:   Objection.   Incomplete
9  hypothetical.
10      A.   That's how we would narrow down our search, yes.
11      Q.   (BY MS. CAGGIANO)   And so if the only place that
12 a carjacking is mentioned is in the executive summary, then
13 you wouldn't find that specific JIRA ticket for a
14 carjacking, right?
15           MR. YOUNG:   Objection.   Vague and ambiguous.
16 Calls for speculation.   Incomplete hypothetical.
17      A.   You can find the term "carjackings" in JIRAs.
18 I -- I can't speak to exactly what strategy we use to
19 locate any specific JIRAs, but, generally speaking, we
20 would use the issue type or any subcategory to try and
21 identify the incidents that we're looking into, yeah.
22      Q.   (BY MS. CAGGIANO)   But you can't search by the
23 executive summary, right?
24      A.   You can search for keywords in JIRA.   That would
25 capture -- that would be captured in the executive summary.

```
            UNITED STATES DISTRICT COURT,
           WESTERN DISTRICT OF WASHINGTON
                    AT SEATTLE
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
AMIE DRAMMEH, and YUSUPHA      )
CEESAY, Individually, as       )
Surviving Parents of CHERNO    )                COPY
CEESAY; and MARAM CEESAY,      )
Personal Representative of     )
the Estate of CHERNO CEESAY,   )
                               )
          Plaintiffs,          )
                               )
vs.                            ) No. 2:21-cv-202
                               )
UBER TECHNOLOGIES, INC.,       )
et al.,                        )
                               )
          Defendants.          )
                               )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

    Videotaped Zoom Deposition Upon Oral Examination of
         DEFENDANTS' FRCP CR 30(B)(6) DESIGNEE


                      Testimony
                         of
                   CORY FREIVOGEL
                     Volume II
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

                    10:00 a.m.

                  July 14, 2022













Kristin L. Mattsen, CCR No. 3280, RPR
```



```
 1              APPEARANCES (All via Zoom)

 2   FOR THE PLAINTIFFS:
                ALEXANDRA B. CAGGIANO
 3              Attorney at Law
                WEINSTEIN CAGGIANO PLLC
 4              600 University Street
                Suite 1620
 5              Seattle, Washington 98101
                alex@weinsteincaggiano.com
 6
     FOR THE DEFENDANTS:
 7              BRANDON Q. TRAN
                Attorney at Law
 8              BUCHALTER
                1420 Fifth Avenue
 9              Suite 3100
                Seattle, Washington 98101
10              btran@buchalter.com

11

12   THE COURT REPORTER AND THE VIDEOGRAPHER:
                KRISTIN L. MATTSEN, CCR No. 3280, RPR
13              MARSHALL FOX, CLVS
                MOBURG REPORTING
14              33400 Ninth Avenue South
                Suite 207
15              Federal Way, Washington 98003
                info@MoburgReporting.com
16

17   ALSO PRESENT:
                LEAH ALTMAN
18              YASI SEDGHANI (where indicated)

19

20

21

22

23

24

25
```

Case 2:21-cv-00202-BJR   Document 129-9   Filed 07/29/22   Page 11 of 14

DRAMMEH vs UBER

July 14, 2022

30(b)(6)
Cory Freivogel

Page 250

```
 1    a camera installed"; correct?
 2         A.   I want to be -- sorry.  Go ahead.
 3              MR. TRAN:  I want to object because I --
 4    if you're going to ask him questions about another
 5    different document, then you probably should show it to
 6    him as opposed to having him guess.
 7              THE WITNESS:  I believe the language is
 8    similar to what you stated.  I don't -- I don't know
 9    precisely what it says, but it sounds familiar, yes.
10         Q.   (BY MS. CAGGIANO)  So let me show you --
11    here's -- here's one taken from a ride in Texas.  Does
12    this look to be what Uber -- the language Uber used in
13    its expanded pilot program for Texas?
14         A.   It does, yes.
15         Q.   And we'll mark this as Exhibit 37.  I didn't
16    mention that.
17              (Exhibit No. 37 marked for
18              identification.)
19         Q.   (BY MS. CAGGIANO)  Okay.  Oh, before we go
20    back.  And this one says "Driver has a dashcam to record
21    trips for added safety."  Do you see that?
22         A.   I do see that, yes.
23         Q.   And that's part of Uber's program today
24    where -- that you were talking about with the Bring Your
25    Own Dashcam.  If an Uber driver registers their dashcam
```

Case 2:21-cv-00202-BJR   Document 129-9   Filed 07/29/22   Page 12 of 14

July 14, 2022
DRAMMEH vs UBER
30(b)(6)
Cory Freivogel

Page 251

```
 1    through Uber, then Uber provides these notifications to
 2    riders before they get into the car that has the dashcam
 3    installed; correct?
 4         A.   Yeah.  That's correct, if they've registered
 5    a dashcam with Uber.
 6         Q.   And the reason for that is it allows the
 7    rider to know and the rider could decline if they didn't
 8    want to be in a car that has a dashcam; right?
 9         A.   Yeah.  It's to inform the rider that the
10    driver has a dashcam.
11         Q.   Do you know when Uber first started putting
12    these notifications on -- on the riders' apps?
13         A.   So it would have been when they had launched
14    these initial pilots in Florida and then Texas and
15    Tennessee, so essentially when the dashcam program was
16    launched.
17         Q.   Okay.  So in approximately sometime in 2018?
18         A.   That's my understanding, yes.
19         Q.   Okay.  Is there any particular type or brand
20    of dashcam that Uber allows drivers to use?
21         A.   We don't prohibit any -- or restrict drivers
22    to any particular type of dashcam through our Bring Your
23    Own Dashcam program.  There may be technical limitations
24    associated with dashcams, but I'm not aware of any
25    policy or anything that requires the use of any
```



```
 1   beneath "Incident - Type"; right?
 2                MR. TRAN:  Again --
 3                THE WITNESS:  I'm not --
 4                MR. TRAN:  -- objection.  Seeks --
 5           I'm sorry, Mr. Freivogel.  Give me -- give me
 6   a second.
 7                Objection.  Seeks information outside this
 8   witness's designation.  Calls for speculation.
 9                THE WITNESS:  I'm not sure what goes
10   where, but I don't see the issue category you're
11   describing.
12        Q.   (BY MS. CAGGIANO)  And you don't see it on
13   this page either, do you?
14                MR. TRAN:  Same objections.
15                THE WITNESS:  I do not.
16        Q.   (BY MS. CAGGIANO)  Do you see it -- I mean,
17   maybe it's been redacted, but you don't see it on this
18   page either, do you?
19        A.   I do not.
20        Q.   Or on this blacked-out square?
21        A.   I do not.
22        Q.   Okay.  And you told me at your deposition a
23   few weeks ago that, when you did research on
24   carjackings, you specifically would look for the vehicle
25   stolen subcategory.  That's how you searched for them;
```

```
 1   right?
 2        A.   In research done internally, yes, that's how
 3   we -- we found it.
 4        Q.   It's been about another hour.  Let's take a
 5   break.  Do you want to take a lunch break now or just
 6   another short break?
 7             MR. TRAN:  I think he's in -- he's in
 8   Chicago, so -- the Midwest area; so he's well past lunch
 9   already now.
10             THE WITNESS:  I'm -- I'm fine either
11   way.  I'm not sure what makes sense for the group.
12             MS. CAGGIANO:  Let's do another
13   ten-minute break.
14             THE WITNESS:  Okay.
15             MR. TRAN:  All right.
16             THE VIDEOGRAPHER:  The time is 12:14.
17   We're now off the record.
18             (Break taken.)
19             THE VIDEOGRAPHER:  We're back on the
20   record.  The time is 12:25.
21        Q.   (BY MS. CAGGIANO)  I am going to share with
22   you what we'll mark as Exhibit 43, and it is UTI067956.
23             (Exhibit No. 43 marked for
24             identification.)
25        Q.   (BY MS. CAGGIANO)  This is a document --
```

