The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DRAMMEH, et al.,

    Plaintiffs,

v.

UBER TECHNOLOGIES INC., et al.,

    Defendants.

Civil Action No. 2:21-cv-202-BJR

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiffs Amie Drammeh and Yusuoha Ceesay, representing the estate of Cherno Ceesay ("Ceesay") (collectively, "Plaintiffs") filed this lawsuit against defendants Uber Technologies, Inc. ("Uber") and Rasier LLC[1] (together, "Defendants") alleging that Defendants' negligence caused the wrongful death of Ceesay, a driver for Uber who was killed by two passengers.[2]  Before the

---

[1] Plaintiffs' complaint describes Rasier as "a wholly owned subsidiary of Uber Technologies and . . . the party that directly contracts with drivers." Dkt. 1 ¶ 15. Neither party describes Rasier as separate from Uber in any legally relevant way.

[2] The two passengers have been charged but have not yet been tried.  *See* Pl. Opp'n, Dkt. 123 at 7 (stating that they are "awaiting trial").  However, for purposes of this order, the Court will assume the allegations against them are true.

1

Court is Defendants' motion for summary judgment. Having reviewed the motion, the record of the case, and the relevant legal authorities, the Court will grant Defendants' motion. The reasoning for the Court's decision follows.

## II.     BACKGROUND

### A.    Ceesay's Murder

On the evening of December 13, 2020, Ceesay responded, using Uber's smartphone app, to a call to pick up and ferry passengers in Issaquah, Washington. *See* Dkts. 129-1, 129-2. These passengers were Olivia Bebic and Devin Wade (hereinafter, the "Assailants")—nonparties dismissed from this action last year. Police Rpt., Dkt. 129-1 at PDF 4-7. The Assailants requested a ride through the app, and Ceesay accepted it. *Id.* The app notified Ceesay of the pick-up location the Assailants had entered. *Id.* Ceesay was found dead in his car minutes after he had at arrived at the pick-up location. *Id.* at PDF 6. Ceesay's car had crashed into a tree about 100 feet from the pick-up location, and Ceesay had multiple stab wounds. *Id.* The Assailants had fled the scene. *Id.*

An Issaquah Police investigation concluded that the Assailants created a fake Uber account, requested a ride, and murdered Ceesay in a botched carjacking. *Id.* at PDF 6-7. The allegedly fake account was registered under the name "Stephanie Tylor."[3] Def. MSJ, Dkt. 93 at 8 n.4. Defendants admit that this account was created and used to request a ride just before the attack on Ceesay. *Id.* When the account was created, Uber verified that the phone number used to register was in the account-holder's possession ("SMS verification") and verified that the account was attached to a valid payment method. *Id.* The Assailants used a prepaid cell phone and a prepaid gift card, both of which are anonymous in that they are not attached to a named account-holder. *See* Dkt. 129-13.

---

[3] An account under Bebic's name was created about two hours before the Tylor account was created. Pl. Opp'n, Dkt. 123 at 5 n.16.

On the day after Ceesay's murder, the Issaquah Police contacted Uber's Law Enforcement Response Team seeking information about Ceesay's passengers, and Uber identified the Tylor account as the last ride accepted by Ceesay. Pl. Opp'n, Dkt. 123 at 7 nn. 29-30. The police traced the phone to the Assailants, who were arrested on December 15, 2020. Police Rpt., Dkt. 129-1 at PDF 6-10; *see also* Dkt. 129-13. Based on interrogations and other information gathered about the Assailants, the police concluded that the two "stabbed [Ceesay] to death in the course of trying to steal his car." Police Rpt., Dkt. 129-1 at PDF 4.

**B.    The Uber App**

Uber's ride-sharing service uses a smartphone app to connect available drivers with people requesting rides. Def. MSJ, Dkt. 93 at 3-4. Riders must create an account in order to request a ride. *Id.* at 4. Creating an account entails entering a name, email address, and cell phone number and agreeing to various terms and conditions. *Id.* As noted above, Uber employs SMS verification to confirm that someone is not attempting to create an account using a phone number that is not their own. *Id.* When a rider uses a phone number to set up an account, a text message containing a code is sent to that phone number, and the rider must then enter the code in the Uber app. *Id.* A particular phone number may only be used for a single account, "which limits [a] person from creating duplicate accounts." *Id.* A particular rider is also prohibited from created multiple accounts using different phone numbers. *Id.*

Uber uses an automated program called "Mastermind" to "assist in identifying potential risk and fraud." *Id.* at 5. Although the exact means of identifying fraud are proprietary and technical, Uber states that Mastermind generally considers: (1) whether the account is similar to other accounts that have been used for fraud; (2) whether the account is similar to other accounts that have not yet been used for fraud but "show suspicious behavior or may be bots;" (3) "whether new users have 'Uber,' 'Support,' or certain other words in their account names which are correlated

with fraud." *Id.* The Mastermind analysis of the information entered by the new user may result in them being prevented from creating an account. *Id.*

Drivers also must create an account in the driver version of the app. *Id.* Creating a driver account entails more steps and more verification than a rider account. Drivers "(1) submit personal identifying information; (2) upload copies of a valid driver's, proof of insurance, and vehicle registration; (3) pass a criminal background check (performed by a third-party) and a driving history check; (4) pass an examination testing [their] knowledge of risk factors for crimes against drivers; and (5) confirm their vehicle has passed a uniform vehicle safety inspection." *Id.* at 5-6. Defendants note that some of the training and testing that Uber drivers undergo relates to potential risks to drivers' safety. *Id.* at 6.

### C. Uber's Relationship with Drivers

The parties agree that, at least nominally, Uber drivers are independent contractors. *Id.* at 7; Dkt. 15 ¶ 2. Defendants describe Uber drivers as having "sole control of the means and manner in which [they] provide[] transportation services and . . . complete discretion to determine the manner in which to operate [their] business." Def. MSJ, Dkt. 93 at 7. Drivers use their personal vehicles and are solely responsible for maintenance and any physical safety measures they choose to implement. *Id.* Defendants also state that drivers control the routes they take to a passenger's destination. *Id.*

Plaintiffs' characterization of Uber's business implies more control over drivers. Plaintiffs note that drivers may only find customers through the Uber app, as Uber "forbids 'street hails.'" Pl. Opp'n, Dkt. 123 at 10. In controlling the digital interface between drivers and riders, Uber controls and supplies "all information Drivers and Riders get about each other." *Id.* (emphasis removed). From a driver's perspective, it appears that this information is limited to the passenger's provided name and pick-up location. *Id.*

4

Uber itself possesses some additional information about riders and uses this information to "verify" their accounts. *Id.* at 13. This verification essentially amounts to ensuring the account is not duplicative or obviously fraudulent and checking that the payment method is valid. *Id.* Plaintiffs claim that, in December 2020, a person could nevertheless create an account and order a ride "completely anonymously" and note that Uber did not require any kind of identity verification as long as payment can be authorized. *Id.* (emphasis removed). Uber did not have any mechanism for verifying that a person opening an account was using their real name, email address, or phone number, and riders could use a form of payment not attached to a bank account. *Id.* at 13-14.

### III.   LEGAL STANDARDS

**A.   Summary Judgment**

"The standard for summary judgment is familiar: 'Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact.'" *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)). A court's function on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If there is not, summary judgment is warranted.

**B.   Negligence**

A negligence claim requires (1) a duty of care, (2) a breach of that duty, (3) injury, and (4) actual and legal causation. *Lauritzen v. Lauritzen*, 74 Wash. App. 432, 438 (1994) (citing *Hansen v. Friend*, 118 Wash. 2d 476, 479 (1992)). The existence of a duty is a threshold question of law decided by the court. *Id.* Therefore, if the court finds the defendant did not have a duty of care, there is no issue of fact for a jury and summary judgment is appropriate. *Id.*

In this case, Plaintiffs must show that Defendants had a duty to protect them from the foreseeable criminal acts of a third party—namely, the Uber passengers who killed Ceesay. Under Washington law, "a private person does not have a duty to protect others from the criminal acts of third parties." *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wash. 2d 217, 223 (1991). The parties generally agree that there are two relevant exceptions to this rule by which Plaintiffs might establish a duty of care.

### 1. Special Relationship

One exception applies when there is a "special relationship" between the parties that gives rise to a duty. *Lauritzen*, 74 Wash. App. at 438. This duty is triggered when "(1) the defendant has a special relationship with the third person that imposes a duty to control the person's conduct; or (2) the defendant has a special relationship with the victim that gives the victim a right to protection." *HBH v. State*, 192 Wash. 2d 154, 169 (2018). In some cases where the Washington Supreme Court has found a special relationship, it has emphasized the degree of control the defendant has over the aspect of the job that gave rise to the plaintiff's injuries. *E.g., Vargas v. Inland Washington, LLC*, 194 Wash. 2d 720, 731-32 (2019) ("[W]hen a general contractor engages a subcontractor and 'retains control over some part of the work,' the general contractor 'has a duty, within the scope of that control, to provide a safe place to work.'"). The court has also recognized a special relationship in situations where the victim is uniquely vulnerable and reliant on a defendant's protection, such as children placed in foster homes by the state. *HBH*, 192 Wash. 2d at 173 ("[O]ur case law confirms that entrustment for the protection of a vulnerable victim, not physical custody, is the foundation of a special protective relationship."). Other recognized special relationships include "a business and a business invitee, an innkeeper and a guest, state and a probationer, . . . a psychotherapist and a patient," as well as a common carrier and its passengers and an employer and its employees. *Id.*; *Robb v. Seattle*, 176 Wash. 2d 427, 433 (2013).

### 2. Misfeasance

The other relevant exception to the rule that there is no duty to protect against third-party criminal acts is a duty recognized "in the limited circumstances [where] the actor's own affirmative act creates a recognizable high degree of risk of harm." *Robb*, 176 Wash. 2d at 433. This narrow exception makes an important "distinction between an act and an omission." *Id.* at 435. A negligent omission—or "nonfeasance"—is not enough to trigger a duty. *Id.* A defendant must affirmatively engage in a "misfeasance" that creates a situation in which a plaintiff is exposed to a high risk of harm to which they would otherwise not be exposed. *Id.* at 437.

### 3. Foreseeability

Plaintiffs must also establish that Ceesay's murder was foreseeable as a matter of law. The Washington Supreme Court has "held that foreseeability can be a question of whether duty *exists* and also a question of whether the harm is within the *scope* of the duty owed. In the latter sense, it is a question of fact for the jury." *McKown v. Simon Property Grp., Inc.*, 182 Wash. 2d 752, 764 (2015) (emphasis added). In the former sense, however, it is the Court's responsibility to determine whether "the specific acts in question were foreseeable rather than whether the [defendant] should have anticipated any act from a broad array of possible criminal behavior." *Id.* at 767. In other words, if a particular criminal act is not reasonably foreseeable based on prior similar acts, then there exists no duty to protect against it, and there is no occasion for a jury to decide the scope of the duty.

## IV. DISCUSSION

Plaintiffs argue that a special relationship exists between Uber and its drivers. Pl. Opp'n, Dkt. 123 at 25. Plaintiffs claim that Uber "has sole and absolute control of whom Drivers are matched with—and then Uber heavily censors the information available to Drivers." *Id.* at 29. Specifically, "Uber did not communicate to Mr. Ceesay . . . that (1) [Uber] had not verified the

rider's identity, (2) the rider account had been opened just minutes before, and (3) the rider was using an anonymous payment method, which is associated with criminal intent." *Id.* Finally, Plaintiffs argue that, even if a special relationship does not exist, they qualify for the misfeasance exception noted above. According to Plaintiffs, Defendants' affirmative act of connecting Ceesay with the Assailants was a misfeasance that created a new risk of harm, and thus a duty of care. *Id.* at 34-37.

Defendants contend that Plaintiffs' special relationship cases are inapposite and do not warrant a further extension of the special relationship doctrine here. Def. Reply, Dkt. 139 at 6-7. Defendants also argue that Plaintiffs cannot succeed on a misfeasance theory, because they allege only omissions, not affirmative misconduct. *Id.* at 20-26. Finally, Defendants state that, whether or not the Court recognizes a special relationship or finds a misfeasance, the attack on Ceesay was "unforeseeable as a matter of law" and thus would not be included within any duty of care owed. *Id.* at 7, 15-19.

**A.      Special Relationship**

Plaintiffs' briefs lack a clear and concise statement of the special relationship they believe Uber has with its drivers.[4] This is a tacit acknowledgement that none of the existing special relationships recognized in Washington fit this context, and any relationship recognized in this case would involve cobbling together elements of selective precedent. Almost all of the cases in which Washington courts have recognized a special relationship involved the physical custody or control of the premises on which a plaintiff was injured—for example, hotels, stores, schools, and hospitals. In asking the Court to find a duty here, Plaintiffs ask the Court to announce a corollary to the typical boundaries of the special relationship doctrine, which is itself an exception to the general rule that

---

[4] Plaintiffs do not allege that Ceesay was an employee or that Uber is a common carrier.

private persons do not have a duty to protect others from third-party criminal conduct. Federal courts sitting in diversity jurisdiction and applying state law are "reticent to formulate any common-law 'special relationship' not previously recognized" without "clear Washington authority." *Buckley v. Santander Consumer USA, Inc.*, 2018 WL 1532671, at *6 (W.D. Wash. Mar. 29, 2018) (noting that it would be inappropriate for a federal court to venture into "uncharted waters" without clear guidance).

Plaintiffs cite only one case in which Washington courts found a special relationship outside of premises liability. In *HBH*, the Washington Supreme Court held that the state had a duty to protect foster children from abuse when it placed them in foster homes that were outside of the state's physical custody. *HBH*, 192 Wash. 2d at 173. Although Plaintiffs cite *HBH* for the principle that Washington courts may find special relationships even in the absence of physical custody, numerous other aspects of that case nevertheless counsel against finding one in this case. The central holding in *HBH* was that "entrustment for the protection of a vulnerable victim, not physical custody, is the foundation of a special protective relationship." *Id.* The state foster care agency's lack of physical custody was outweighed by the vulnerability of the victims and the responsibility with which the state had been entrusted, such that it was essentially the equivalent of physical control. *See id.* at 173-74 (agreeing with U.S. Supreme Court that foster care is analogous to incarceration or institutionalization). *HBH* thus illustrates that the Washington Supreme Court is willing to recognize special relationships outside of premises liability, but it also suggests it will only do so in exceptional cases. It is unlikely the court would consider this case exceptional. Uber drivers are clearly not as vulnerable as foster children, and providing drivers with the location of a passenger and processing a payment is not equivalent to a state foster care agency that "controls the placement of [a] child, determines the child welfare services to be provided, and decides when

the child will be removed from a foster home." *Id.* at 174. It is also not equivalent to the second case Plaintiffs cite, in which the court found that an elderly group home had a responsibility to protect "[p]rofoundly disabled persons that are totally unable to protect themselves and are thus completely dependent on their caregivers for their personal safety." *Niece*, 131 Wash. 2d at 46.

The third and final case Plaintiffs cite to support their special relationship theory is *Vargas*, in which the Washington Supreme Court found a general contractor had a duty to a subcontractor, despite the fact that the latter was not an employee. *See Vargas, LLC*, 194 Wash. 2d at 731-33. *Vargas* did not involve a "highly vulnerable" victim as in Plaintiffs' other cases, but it is inapplicable for other reasons. First, as Defendants observe, "[e]very case that has cited the relevant duty language in *Vargas* has done so in the narrow context of [a] general contractor's duty to maintain a safe worksite."[5] Def. Reply, Dkt. 139 at 3 n.2 (citing cases). The crux of *Vargas* was that the defendant general contractor "supervised the jobsite and had a right to exercise control over the work of the various entities on the jobsite," where the plaintiff was injured by a malfunctioning hose. *Id.* at 734. *See Vargas, LLC*, 194 Wash. 2d at 731-33. Plaintiffs do not allege Uber "supervised" any aspect of Ceesay's transportation of passengers. Additionally, the place in which Ceesay was attacked—his car—was not a "worksite" over which Uber "retained" control. Even if Uber had provided the car to Ceesay, it could not control Ceesay's safety in the same way a general contractor can control a tract of private property. Given the constantly changing nature of a car's environment and passengers, it is not analogous to a worksite.

In summary, this Court finds that Uber's role is not sufficiently supervisory to impose on it the degree of responsibility that a special relationship requires. The distinctions between this case

---

[5] Defendants also note that "[t]he *Vargas* decision dealt with the 'expansive statutory and common law duties' that general contractors have 'to provide a safe workplace'" and that no such parallel exists here. Def. Reply, Dkt. 139 at 5 (citing *Vargas*, 194 Wash. 2d at 722-23).

and those cited by Plaintiffs are simply too many and too stark for the Court to venture into "uncharted waters" and recognize a special relationship between Uber and its drivers. Accordingly, the Court finds that Plaintiffs cannot establish duty on this basis.

### 1. Misfeasance

Plaintiffs' alternative theory of duty is that it was Defendants' affirmative misfeasance that created the circumstances that enabled the Assailants to murder Ceesay. Pl. Opp'n, Dkt. 123 at 34. The misfeasance identified by Plaintiffs includes "Uber's allowing [the Assailants] on the Uber platform using a gift card without requiring ID verification, its failure to give Mr. Ceesay the means to identify such risky riders, and its failure to provide, require or even encourage Mr. Ceesay to use a dashcam integrated with the Uber app." *Id.* at 35. Plaintiffs suggest that, even if these are viewed individually as omissions, the appropriate question is "whether the actor's entire conduct created a risk of harm."[6] *Id.* at 34 (quoting Restatement (Third) of Torts: Physical and Emotional Harms § 37 cmt. (c)) (emphasis omitted).

Plaintiffs may be correct that certain omissions can amount to misfeasance if they create a risk of harm that would otherwise not exist. The Washington Supreme Court has stated in dicta that "[a] driver affirmatively create[s] a new risk to a pedestrian by failing to stop his or her car [at a crosswalk]." *Robb*, 176 Wash. 2d at 437. However, none of the omissions identified by Plaintiffs created the risk that resulted in Ceesay's death. Plaintiffs' own statistics show that carjacking is a broad societal problem. *See* Pl. Opp'n, Dkt. 123 at 20. There is no evidence or allegation that anything Defendants did actively encouraged carjackings or "create[d] a special or particular temptation or opportunity for crime." *Hutchins*, 116 Wash. 2d at 232-33; *see also Jane Doe 1 v.*

---

[6] Defendants note that Washington has not adopted the Third Restatement or the concept cited by Plaintiffs. Pl. Opp'n, Dkt. 123 at 23-24.

*Uber Techs., Inc.*, 79 Cal. App. 5th 410, 425 (finding Uber did not engage in misfeasance and contrasting a case in which a "plaintiff was injured by third parties doing exactly what defendant's conduct *encouraged* them to do" (emphasis added)).  Even if it were conclusively shown at trial that the risk of carjackings would have been reduced if Defendants had implemented the measures demanded by Plaintiffs, it still would not follow that Defendants *created* the risk.  Washington courts have rejected the idea that "the failure to take [preventative measures] against crime is not in and of itself a special temptation to crime." *Sourakli v. Kyriakos, Inc.* 144 Wash. App. 501 (2008).

The Court agrees with Defendants that Plaintiffs' claims are properly understood as alleging that Defendants "failed to eliminate a risk." Def. Reply, Dkt. 139 at 20.  Washington courts have been clear that a failure to eliminate a preexisting risk does not itself create a duty of care. *Robb*, 176 Wash. 2d at 439 (noting the "firm line between misfeasance and nonfeasance").  Furthermore, the Washington Supreme Court has found misfeasance as a basis for duty only once. *See Washburn v. City of Federal Way*, 178 Wash. 2d 732 (2013) (police officer knew or should have known that third party would react violently to service of restraining order).  It is obvious that Washington courts view this doctrine as applicable only in exceptionally compelling circumstances, and those are not present here.  Accordingly, the Court finds that Plaintiffs cannot establish duty based on a misfeasance.

   2.   **Foreseeability**

The Court also finds that Plaintiffs have not established that the attempted carjacking and murder of Ceesay was a foreseeable result of Uber's connecting the "Stephanie Tylor" rider account with Ceesay via the Uber app.  Plaintiffs purported evidence of foreseeability is that Defendant knew that fraudulent, duplicate, and anonymous accounts were correlated with "criminal intent." *See* Pl. Opp'n, Dkt. 123 at 33.  Plaintiffs also point to some evidence that carjacking, specifically,

is connected to this type of suspicious activity. However, aside from generalized statistical data and expert testimony about the increased frequency of carjackings, the vast majority of Plaintiffs' evidence originated *after* Ceesay's murder in December 2020. Plaintiffs rely heavily on an "early 2021" internal report called "Responding to Carjacking" and an April 2021 blog post describing a new ID verification requirement that Plaintiffs say would have prevented the Assailants from requesting a ride.[7] *See id.*

      Federal Rule of Evidence 407 bars evidence of subsequent remedial measures when offered to prove negligence. Fed. R. Evid. 407. Plaintiffs do not deny that the documents they rely on constitute subsequent remedial measures but claim that they are proffering them for a purpose outside the scope of the rule. Plaintiffs cite an advisory committee note stating that evidence of remedial measures is admissible to show "existence of duty." Pl. Opp'n, Dkt. 123 n.189 (citing Advisory Committee Notes to 1972 Proposed Rule, Fed. R. Evid. 407). It is not clear what the Advisory Committee intended by that comment, but Defendants correctly observe that the Ninth Circuit has interpreted Rule 407 as prohibiting subsequent remedial measures as evidence of "what was knowable" prior to the plaintiff's injury or more broadly to establish a "duty to warn." Def. Reply, Dkt. 139 at 10-12 (citing *Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948 (9th Cir. 2012). Plaintiffs are clearly offering the post-incident reports to prove that Uber knew or should have known of the carjacking risk and that Ceesay's murder was foreseeable based on this knowledge. Plaintiffs make no argument as to why *Rosa* should not apply. "In examining whether summary judgment is appropriate, [courts] 'consider only alleged facts that would be admissible in evidence

---

[7] Plaintiffs' surreply cites additional documents that allegedly show Uber had "[p]rior knowledge of the risks to drivers of anonymous payment methods of payment," but many if not all of these documents also appear to have originated after Ceesay's murder. Pl. Surreply, Dkt. 148; *see, e.g.*, Dkts. 149-1, 149-2; *see also* Def. Surreply, Dkt. 162 (Defendants' surreply noting that all documents were created in 2021).

[at trial].'" *Rosa*, 684 F.3d at 948 (quoting *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1260 (9th Cir. 1983)). Plaintiffs' post-incident evidence would be inadmissible as evidence, and thus the Court will not consider it here.

Plaintiffs' remaining, pre-December 2020 evidence is largely comprised of internal incident reports maintained by Uber (called "JIRA tickets") and collated by Plaintiffs. *See* Pl. Opp'n, Dkt. 123 at 15; Dkt. 129-61. Plaintiffs claim that the "JIRA data shows that beginning in the second quarter of 2020 after the start of the pandemic, there was a staggering increase in the rate of carjackings." Pl. Opp'n, Dkt. 123 at 39. However, based on the record, the JIRA data does not suggest a statistically significant connection between fake or anonymous accounts and carjacking, nor do Plaintiff's experts' opinions support that connection. One of Plaintiffs' experts, who has experience in the "payments industry" but not specifically with Uber, opined that "anti-money laundering professionals and law enforcement personnel have known for years that prepaid/gift cards and other anonymous forms of payment are the payment method of choice of criminal elements, including (for example) those involved in human trafficking and drug trafficking." Corrigan Decl., Dkt. 124 ¶ 6. There is no further evidence to support an inference that the same applies to carjacking.

Without this evidence, there is no link between anonymous accounts like the "Stephanie Tylor" account and carjackings, let alone murder. Plaintiffs' statistical evidence may show Uber was aware of an increase in carjackings in 2020, but that does not mean a carjacking was foreseeable in this case. *Kim v. Budget Rent A Car Sys., Inc.*, 143 Wash. 2d 190, 199 (2001) (Washington Supreme Court "has rejected utilization of high crime rates as a basis for imposing a tort duty"). To establish a legal duty, Plaintiffs were required to show that it was foreseeable the Assailants would use the Uber app to commit a carjacking and murder Ceesay. *See McKown*, 182 Wash. at

767. Legal foreseeability is based on whether the specific acts in question were foreseeable rather than whether Defendants should have anticipated any act from a broad array of possible criminal behavior. *Id.* The Court finds that Plaintiffs have failed to establish that the sequence of events leading to Ceesay's death was foreseeable. Further, the Court finds that Plaintiffs have failed to establish that Defendants had a duty of care. Because Plaintiffs have failed to establish these threshold elements, they cannot make out a claim for negligence, and summary judgment is appropriate.

## IV.   CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. 93) is GRANTED, and Plaintiffs' claims are dismissed. Plaintiffs' motions to seal several of their filings (Dkts. 112, 122, 146) are GRANTED. The Court strikes the remaining motions on the docket (Dkts. 92, 102, 107) as moot.

DATED this 27th day of September, 2022.

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE